THOMAS ALSTON *v.* JOHN THOMAS et al.
[No. 67, October Term, 1931.]

618

*Decided January 14th, 1932.*

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, PARKE, and SLOAN, JJ.

*H. Hamilton Hackney,* for the appellant.

*Richard E. Preece,* for the appellees.

PARKE, J., delivered the opinion of the Court.

John Thomas and Lillian Thomas, his wife, filed a bill of complaint against Thomas Alston and his unnamed infant child for the purpose of obtaining a decree which would adjudge the infant Alston to be the adopted child of the complainants, and change the name of the infant to John Thomas. Thomas Alston, the father, filed an answer, and the cause went to trial before the chancellor, who, after hearing the witnesses, awarded the permanent care and custody of the infant to the plaintiffs, but reserved the matter of the adoption of the infant and the proposed change of his name for further consideration. It is from this decree that the father has taken an appeal.

Jennie Alston, the wife of Thomas Alston, was an insane patient at Bay View Hospital, where she gave birth to an infant son on March 26th, 1930. The mother never left the hospital, and died there on January 4th, 1931. The baby was kept at the hospital during the nursing period, and did not leave until in September, 1930, when he was placed in the home of the plaintiffs. Although denied by the father, there does not seem to be any reasonable basis for disbelief that the accredited nurse at the hospital went to the father's home and found living there in crowded quarters the father and four daughters, whose ages ranged from fourteen, nine, seven and five years; that the father was asked if he could take care of the infant, and that his reply was that he could not, but would be obliged if a home could be found not only for the baby, but also for one of his other daughters. Acting upon this assent, the officers of the hospital delivered the child into the care and custody of the plaintiffs in September, 1930, after an investigation had informed the hospital authorities that the plaintiffs were a childless colored couple of respectability and good character, and able comfortably and properly to support, maintain, and educate the infant in accordance with his station in life. The nurse at the hospital had an attorney prepare a paper by which the father consented to the adoption of the infant by the plaintiffs; and she left this document with the father, and later repeatedly went to his home, but did not find him there, and his signature was never obtained.

The father was indifferent to the baby's existence, and did not attempt to get the child out of the hospital, nor did he know what had become of the baby, because he did not make any inquiry until the baby had been in the custody of the plaintiffs for three or four months. Then the officials of the Family Welfare Society asked of the hospital what had been done with the baby, and stated that Alston wanted the infant, as he had found a relative who would take care of his babies. A representative of this organization first visited the home of the plaintiffs, after the infant had been with them four months, and then Lillian Thomas and her father

and mother went to the officer of this charitable society and met the father, who said he did not want the child to be adopted, but to be returned to him to raise.

Our conclusion on the whole record is that the father had abandoned the child, and the child had become a public charge when the arrangements were made with the plaintiffs to take the child and rear him as their own. In the four months of their care and charge of the baby, the plaintiffs had grown to love him, and, when the father's attitude changed and their right to the custody of the child was challenged, the plaintiffs proceeded to put their informal relation to the child upon a permanent legal basis.

At the time the father intervened, there was no adjudication to deny his paternal rights, and therefore the plaintiffs must clearly show that it would be in the best interests of the infant to award his custody and control to parents by adoption in the face of opposition of the surviving natural parent. In determining what disposition should be made, the station in life and the poverty of the father is not to weigh against his claim, since an humble status and indigence are the honorable condition of many, and often the fruitful soil of virtue, discipline, and aspiration. Should the parent, however, callously abandon the child in its helpless infancy, and leave his parental duty to the waif to be discharged by public or private charity, the chancellor will look well to the circumstances before the parent, who has abandoned the child, may be restored to the possession of the baby. Having forfeited the confidence of the court by his conduct, the sincerity of the claim of the father is not clear, and it is imperative that the welfare of the child rather than any paternal right must be the controlling factor.

The plaintiffs and the father and child are negroes, so no racial question is involved. The foster mother and father of the baby, who is now about twenty-two months old, are of good character, and no personal objection is urged. They can give the child in its tender years a comfortable and stable home, and are able suitably and properly to support, rear, and educate the child. The physical, moral, and mental

advantages to the child from an adoption by the plaintiffs incline the scales greatly against the father, who, although according to the views of some witnesses, is said to be able properly to bring up his child, is shown by this record to live in two rooms, on the second story of a house in Baltimore City, with his four young children; to be absent from his living quarters because of his work as a laborer, and, since January, 1931, to rely upon the voluntary services of a sister-in-law for the care of his family during his absence. Furthermore, he is unable to support his present family, and, for some time, has been the object of public charity. Under these circumstances, the court is convinced that the best interests and welfare of the child will be promoted by his adoption by the plaintiffs. The decree, however, did not declare the infant the adopted child of the plaintiffs, as authorized by sections 74-79 of article 16 of the Code. Apparently proceeding under section 80 of article 16 of the Code, the chancellor formally reserved in the decree the question of adoption, and adjudged "the plaintiffs be awarded the permanent care and custody of the infant child, Baby Alston, from this date." In this there was error, because the decree should have been one of adoption. Moreover, the court had no power to award permanent custody or guardianship, as the statute contemplates a continuing, supervisory jurisdiction, and prescribes that the court may "from time to time thereafter annul, vary or modify its decree or order in relating (relation) to such child or children." Section 80 of Article 16. It follows that the cause will be remanded for the passage of a decree in conformity with the views here expressed.

> *Decree reversed, with costs to appellant, and cause remanded for the passage of a decree in conformity with this opinion.*