## GEORGE MILTON LAGUMIS *v.* EX PARTE, ADOPTION OF MILTON LAGUMIS

[No. 82, October Term, 1945.]

*Decided March 14, 1946.*

*Motion for Modification of Opinion expunged from the Record, May 13, 1946.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Paul Berman,* with whom were *Joseph R. Hirschmann* and *Sigmund Levin* on the brief, for the appellant.

*Benson Gross,* with whom was *Ellis Levin* on the brief, for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by George Milton Lagumis from a decree of Circuit Court No. 2 of Baltimore City as a result of a petition filed by Dimitrios George Triktis and Faith Mary Triktis, his wife, whereby his infant child, born January 12, 1932, was decreed to be the legal adopted child of Dimitrios George Triktis, together with Faith Mary Triktis, its natural mother, and by which the name of the infant was changed from Milton Lagumis to George Milton Triktis.

The appellant and Faith Mary Triktis (formerly Lagumis) were married on April 27, 1930. In June or July, 1932, the appellant deserted his wife and infant child, then six months old, in Baltimore and moved to New York. On October 4, 1937, over five years after she had been deserted Faith Mary Lagumis obtained a divorce *a vinculo matrimonii* from the appellant on the grounds of desertion and the same day was married to Dimitrios George Triktis. The mother of the infant child testified that between the time of the separation and her remarriage her former husband gave not more than $75 for the support of the child. The appellant says he sent his former wife between five and six hundred dollars during that five-year period for the boy's support. During that period the father had never seen his child, and according to the mother's testimony, made no effort to do so. The appellant says that during that five-year period he tried many times to see the boy, but on account of objections he had never seen him.

In 1938, after his wife had remarried, appellant filed a petition in court for custody of the child and as a result of that petition the court ordered on September 2nd of that year that he be permitted by the mother to take the boy from her home on alternate Sundays, between the hours of 1 P. M. and 6 P. M., but not to remove him from the State. The wife testified that after the order of custody was signed in 1938 her former hus-

band never saw his son. From the information before us it appears that the appellant, up until the time of the proceedings in the case at bar, had seen his son but once since 1932, that time being when the custody proceedings were brought in Baltimore in 1938. The mother says that the father never tried to see the child either before or after 1938. The appellant says that the reason he did not see the boy after the court order was signed was because his former wife, father-in-law and mother-in-law objected and he did not want to make any trouble because he knew if he tried to see his child that it would mean fights and quarrels. He gives no particular occasions on which he tried to see the boy or details of the objections made, other than the time of the custody hearing in 1938, when he tried to speak to his son, Triktis said, "Stay away from him, keep your hands off him," and an occasion when his former wife was working in the beauty parlor in the Emerson Hotel in Baltimore and he went there to see his former wife and the child, and she refused to bring the boy there. The appellant was remarried in 1939. He admits that since his former wife remarried in 1937 he has never contributed anything to the support of the child.

The appellant is employed as a bartender in New York, makes $60 a week, lives in a four-room apartment with his wife and pays $45 a month rent. He objects strenuously to the adoption by the petitioners in this case and said that he would be very glad to have the custody of his son; that he is able to take care of the child and give him an education and has the facilities for him; that he wrote his former wife a letter and asked her to bring his son to New York and he would pay the expenses. Although his former wife and her sister came to New York the child was not brought with them. No children have been born to the appellant and his wife.

Dimitrios George Triktis, who seeks adoption of his step-son, together with the natural mother, is a chef in a restaurant in Baltimore and earns $100 a week. The boy in question has lived with his mother and step-father

since their marriage. According to all the information before us, the boy and his step-father have been getting along very well. The step-father has supported him and bought him food and clothing. The boy uses the name Triktis as his own in school. The step-father wants to adopt him, to support him, and make a future for him. He says he loves the boy and will educate him to the best of his ability. Triktis and his wife have had no children born to them.

The natural mother of the child states that her present husband is a hard working man, makes an honest living and can afford to take care of the child. He loves the boy very much, feels like a father to him after eight years of companionship with him in the home. If the child wants to study and get a profession his step-father will help him do so.

Although the mother and step-father were married the day of her divorce, it is pertinent that she waited for five years after her husband deserted her before obtaining a divorce. At the time of this proceeding the step-father, mother and boy lived in a small, two-story house in Baltimore. The neighbors testify that the step-father is hard working and the home run in an excellent way. The step-father treats his step-son like his own son and the petitioners appear to be devoted to each other and to the child.

The boy in question is now thirteen years of age and testifies he is in the seventh grade in a junior high school. He appears to be of more than ordinary intelligence for his years. He states that he gets along nicely with his step-father. He loves him. He does not know his real father and to his knowledge has never seen him. His real father has never visited him, has never sent him anything, not even a birthday card, and he wants his step-father to adopt him.

The Maryland statute, applicable to this case, is codified as Section 78, Article 16, of Flack's 1939 Annotated Code, which substantially follows: "The several equity courts of this State, upon the application of any person resid-

ing in the city or county where such application is made, or the equity court in the city or county where a person to be adopted resides, shall have power to pass a decree declaring any person the adopted child of the petitioner, upon such reasonable notice to the parent or parents, guardian or guardians, of such child, if any there be, where a child is to de adopted, * * * by summons, order of publication or otherwise, as the court may order to be given, provided that the court passing the decree shall become statisfied, upon careful investigation, in the case of a child, that the best interests and welfare of said child will be thereby promoted, and provided further, that the child, if of sufficient intelligence and capacity to give an understanding assent, * * * shall so desire * * *."

As the father was notified, and as the child is of sufficient intelligence and capacity and gives an understanding assent, the question before us is whether "the best interests and welfare of the child in question will be promoted by the adoption and change of name decreed below." The test depends on the facts of each particular case.

In considering the question now before us we must keep in mind the provisions of Article 16, Section 81, which provides in part that the decree of adoption entitles the child to the same rights of inheritance and distribution as to petitioner's estate, and the same rights of protection, education and maintenance as if born to such petitioners in lawful wedlock, and the natural parents of such child shall be freed from all legal obligations towards it.

As pointed out in the case of *Spencer v. Franks*, 173 Md. 73, 195 A. 306, the decree of adoption is purely statutory. The measure of the Chancellor's authority is the statute. Unlike a decree for custody, it is of a permanent nature. There seems no reason in this case to leave the custody of this boy in a temporary state. See "Adoption in Maryland," Maryland Law Review, Vol. VII, No. 4, page 275, June, 1943.

As the natural mother will remain the mother regardless of our decision in this case, the question before us is narrowed to whether the best interests of this boy will be promoted by making him the son of the step-father or by allowing him to remain the son of his natural father.

The appellant cites many out of state cases, particularly those of New York State. In New York adoption cannot be permitted against the opposition of a parent unless the parent has abandoned the child or comes within other exceptions not applicable to the Maryland law. For these reasons these cases are not helpful here. The case of *In re Bistany*, 239 N. Y. 19, 145 N. E. 70, was decided against adoption by a vote of four to two, one judge not voting. The majority opinion was written by Judge Cardozo and the dissenting opinon by Judge McLaughlin. Neither the majority nor minority opinion suggested that "abandonment" means positive moral wrongdoing or anything more than voluntarily relinquishing his parental rights and duties. From the evidence now before us there is no doubt that the appellant voluntarily relinquished his parental rights and duties.

In the case of *Connelly v. Jones,* 165 Md. 544, 170 A. 174, the child sought to be adopted by its great-aunt was placed with her when about three years of age when the mother was ill and in need of an operation. After the operation and confinement in Spring Grove Hospital, she died. The father since that time had obtained only odd jobs and visited the child infrequently for the reason that he could not afford the expenses of the trip from Baltimore to Queen Anne's County where the great-aunt lived. He had contributed practically nothing to the maintenance of the child because he says his resources would not permit it. Chief Judge Bond, in an opinion denying adoption in that case, pointed out that whatever shortcomings the father may have, they were not such as to justify depriving him of his relationship to the child and, further that the child was too young to be consulted. The court further pointed out in that case

that, although the provisions of the adoption statute above set forth contained no reference to the natural right of the parents, that the laws do not mean to deprive parents of their own children except under extraordinary conditions, which did not exist in that case. That case is readily distinguishable from the one at bar. In the case now here, the father was able to materially help in the support of his child, which he did not do. His reasons as to why he did not visit the child are not convincing, particularly as he had a court order giving him that right. An important feature lacking in that case and present in the one here is that the child here, who is intelligent for his age, is very anxious for his step-father to adopt him. There appears little probability that this boy would grow to cherish the natural tie with his father when the step-father has been everything which his natural father should have been to him.

In the case of *Alston v. Thomas,* 161 Md. 617, 158 A. 24, the petitioners had had the custody of a child less than two years old for a period of about four months. They were of good character and able and willing to properly support, rear, and educate it. The father had abandoned it after the mother's death so that it remained a public charge until petitioners had taken it. The father lived in two rooms with his four other children. He himself, was the object of public charity. Judge Parke, speaking for the court in that case, said at page 620, of 161 Md., at page 25, of 158 A: "At the time the father intervened, there was no adjudication to deny his paternal rights, and therefor the plaintiffs must clearly show that it would be in the best interests of the infant to award his custody and control to parents by adoption in the face of opposition of the surviving natural parent. In determining what disposition should be made, the station in life, and the poverty of the father is not to weigh against his claim, since an humble status and indigence are the honorable condition of many and often the fruitful soil of virtue, discipline, and aspiration. Should the parent, however, callously abandon the child in its

helpless infancy, and leave his parental duty to the waif to be discharged by public or private charity, the chancellor will look well to the circumstances before the parent, who has abandoned the child, may be restored to the possession of the baby. Having forfeited the confidence of the court by his conduct, the sincerity of the claim of the father is not clear, and it is imperative that the welfare of the child rather than any paternal right must be the controlling factor."

In a later case, *Waller v. Ellis,* 169 Md. 15, at page 23, 179 A. 289, the court pointed out that the whole purpose of the statute is to insure the welfare of the infant.

In the instant case from the testimony before us, as in the case of *Alston v. Thomas, supra,* the father here callously abandoned the child in its helpless infancy and left the parental duty to the boy to be discharged by his mother with practically no help from the father, and no visits to the child. According to the boy's testimony he had never seen his real father, who had never visited him, never sent him anything, not even a card on his birthday.

Under the statute, it is well provided that the child be given the opportunity to express his desires. Why should the wishes of this intelligent thirteen-year-old be disregarded? There is no evidence that he is putty in the hands of his step-father. On the contrary, both in the books and in life, it seems that step-children break marriages about as often as step-fathers break children. The wishes of the mother, the person who by nature has the best interests of the infant at heart, should certainly be given weight.

In this case the boy has been using the name of his step-father. If the National Selective Training and Service Act, 50 U. S. C. A. Appendix, Sec. 301 *et seq.,* remains in effect, this boy in time will become a member of the armed forces of his country and thereby compelled to use the name of his natural father, if adoption is denied, a name different from the one by which he is known to his school mates, friends, and acquaintances.

The Maryland statute differs from that of most of the states in not requiring consent of the parents in any case, but requiring notice to them. We should not read into that statute an absolute, arbitrary veto on the part of a parent.

From the facts before us in this case, the natural father is an absolute zero.

We believe the best interests and welfare of this boy will be promoted in making him the son of his step-father, the only father the child has ever known, whom the child loves and respects, after eight years of companionship with him, the husband of his mother, rather than to leave him the son of a man who deserted him in infancy, whom he has never seen, and who had sent him nothing, not even a birthday card. It is difficult to see what the boy is losing by the adoption decree. The advantages to the boy of such a decree appear to be great. The advantages to the boy in denying the decree are highly speculative.

The natural father has himself shifted to the step-father during the past eight years the protection, education and maintenance of his son. The court should now make it legal.

*Decree affirmed, with costs.*

The following dissenting opinion was filed by MARBURY, C. J., and concurred in by HENDERSON, J.

The adoption of children, although recognized by the civil law, was unknown to the common law, and is with us purely of statutory creation. *Hillers v. Taylor*, 108 Md. 148 at pages 155 and 156, 69 A. 715. Until such a statute was passed, it has been held that there could be no adoption establishing the legal relation of parent and child. *Zimmerman v. Thomas*, 152 Md. 263, 136 A. 637. The first statute passed in Maryland was Chapter 244 of the Acts of 1892 which added six additional sections to Article 16 of the Code, numbered 62A to 62F, both included. Section 62A has been amended in several

respects, but insofar as the questions before us in this case are concerned, it is practically identical with the present statute which is Section 78 of Article 16. That statute has been construed in a number of cases before this court, one of the most exhaustive of which is *Spencer v. Franks,* 173 Md. 73, 195 A. 306, 309, 114 A. L. R. 263. The court in that case said, "The statute, however, confers jurisdiction with respect to the single subject matter of adoption, with a permitted change of the child's name if the petition contains a prayer to that effect," and "Since the general effect of the decree of adoption under the statute was to terminate the legal relations between the child and its natural parents, the statute contemplated that the custody of the infant * * * shall no longer be the right of the natural parents, but [shall] be the exclusive right of the adoptive parents." In that case, after an adoption had been perfected, the natural mother filed a petition for custody of the infant during a stated period. This court said that the privilege of seeing the child should have been left to the discretion and determination of the adoptive parents, and reversed an order which permitted the natural mother to have her seven-year-old boy on one Saturday in every month from nine o'clock in the morning until five in the afternoon. This case shows the length to which this court has gone in determining the respective rights of the adoptive parents and the natural parents after an adoption has been decreed. The old ties are severed, and so long as the adoptive parents treat the child properly, they do not have to permit the natural parents to see it at all, if, in their discretion they think it advisable not to. The result far transcends the effect of any decree of custody.

The statute Article 16, Section 78, gives the court power to pass an adoption decree "upon such reasonable notice to the parent or parents, guardian or guardians, of such child" as the court may order to be given, with two provisos. The first is "that the court passing the decree shall become satisfied, upon careful investigation, in the case of a child, that the best interests and welfare

of such child will be thereby promoted." The second proviso is "that the child if of sufficient intelligence and capacity give an understanding assent, * * * shall so desire."

In the case before us the father, of course, had notice. He objects. The child was asked to testify, and assented to the adoption. The statute in these two respects was satisfied, although it seems ridiculous to suppose that a boy, who did not even know his father and who had been living with his mother and step-father who had treated him kindly, could be expected to do anything less than assent to his adoption. If he objects it would be such an extraordinary circumstance that the Legislature was warranted in making this a prerequisite to the right of the court to pass a decree. If he assents, the requirements of the statute are satisfied, but little else is determined.

The question of custody arises in this case only if the adoption is granted. The mother now has the custody, although the father has tried to get it and has failed in his efforts. He has the privilege of seeing the child, but since he lives in New York and the child in Baltimore, and his means are not unlimited, it is a privilege which he is unable to exercise. He has not exercised it partly because of this fact, but primarily, as he states, because of the hostile attitude of his wife and her family towards him, and because of the fact, as he says, every time he goes near them there is a fight. Nevertheless, he has the privilege of seeing the child. This will be taken away from him by the action of the majority of the court affirming the decree of adoption, and the privilege of seeing the child will then be wholly contingent upon the discretion and determination of his wife and the step-father. *Spencer v. Franks, supra.*

The question then is adoption with change of name, change of father, and complete change of control. And the test is the other proviso that the court is satisfied that the best interest and welfare of the child will be thereby promoted. That is also the test in custody cases

under Article 16, Section 85, *Kartman v. Kartman,* 163 Md. 19, 161 A. 269, but the application of such test in an adoption case is essentially different from its application in a custody case. In a custody case, the question is who shall have the immediate control, with the right in the court at any time, to change such control if the conditions warrant it. It is not permanent and it is at all times subject to change. *Pitts v. Pitts,* 181 Md. 182, at page 192, 29 A. 2d 300. In an adoption case, the change from one father to another as (in this case) is permanent, the change of name is permanent, and permanent custody goes along with it, and the last is subject to the action of a court only to the extent that the custody of any child is subject to such action if a proper petition is filed. Now that the decree of adoption has been affirmed, young Lagumis will no longer be the son of his real father, but will be the son of the step-father, Triktis. He will become George Milton Triktis and step-father Triktis will become his adoptive father with full rights of control and custody over him, just as permanent as those of any natural father could be.

This is a drastic change and cannot be justified on the ordinary ground that it is for the best interest of the child to be reared by his mother and step-father. That is the case now. To justify the further change it must be shown that for some reason it is best for the child that he be cut off entirely from his father, and that he bear a new name. What are the facts? The father deserted the wife and the child when still an infant. The circumstances of that desertion are not shown. After a lapse of a period of several years, during which the mother had custody of the child, she brought suit for a divorce, which she obtained, and immediately married her present husband. Thereupon the father applied for the custody of the child, but the court refused to give it to him, and there is no criticism of that action in the present case. The child was of tender years and the father was a non-resident. Nor is there any contention before us that the father, who has since married again,

should now have custody of the child, although he does desire the right to see his son at reasonable times and under proper circumstances. Neither the father nor the step-father are wealthy. Both are apparently of the same national origin; the father is employed as a bartender, and the step-father as a chef. The latter makes somewhat better wages, but there is not enough difference to justify a finding that this would warrant the change of parent and the change of name. The father has no other child and the step-father has no children. But the question is not to be decided on terms of leaving the father without a child or giving a child to the step-father. Their respective reactions are not controlling. The father has done little for the child, which he excuses by the fact that his wife did not want him to have anything to do with it and was able to support it. The step-father has, of course, supported the boy since he has been married to its mother, which was an obligation he took upon himself by marriage.

The question therefore presented is whether, because a mother wants it and because a step-father wants it, and where there is no particular pecuniary or other advantage to be gained by it, a boy should be taken permanently from his father's name and his father's relationship and given the name and parenthood of his step-father. We have found no reported case, and have been referred to none, in which a step-father has been allowed to adopt a child over the objection of a father. There is, however, a case in this court which seems to point the way. In that case the child concerned was a seven-year-old girl. The father was able to obtain only odd jobs, was dependent upon charity and was not able to maintain a home. The mother had become insane and died. The child's great-aunt and her husband took care of the child and the father visited it only infrequently, because of lack of means. For the same reason he had contributed very little to its maintenance. This court said if the question was one of care and custody the child might well be left with the great-aunt. "But the petition

filed by the appellees goes far beyond the question of care and custody; it seeks a permanent severance of the legal relation of the parent and his child. For that extreme measure the facts show, in the opinion of this court, no justification. Whatever shortcomings the father may have, there is no such unworthiness suggested as would require or justify depriving him of his relation to his child. And the child, now too young to be consulted, has an interest to be protected. In all probability she will in the course of time grow to cherish the natural tie with her own father, and the severance of it now may prove no small grievance to her.

"The statutory provisions for adoption of children, Code, Art. 16, Secs. 4 to 76, themselves contain no references to the natural right of the parents, but it requires no argument to support the implication that the laws do not mean to deprive parents of their own children except under extraordinary conditions, such as do not exist in this case. *Alston v. Thomas,* 161 Md. 617, 620, 158 A. 24; *Kartman v. Kartman,* 163 Md. 19, 161 A. 269." *Connelly v. Jones,* 165 Md. 544, 170 A. 174, 175.

It seems to me that the words of Chief Judge Bond, just quoted, should settle this case. There is no justification in the evidence for the extreme measure asked for. The father has shown no such unworthiness as would require or justify the severance of the relationship between him and his child, and the consent of the child carries no weight except that of satisfying the statute. When he becomes older, he may want and need the blood relationship which the court below has denied him. Now he has both the care and kindly attention of his step-father and the relationship with his own father to which he is entitled by blood and inheritance. He should not be deprived of the one without some compensating factor on the other side. I am able to find none, and I think the court should adhere to the rule that has already been laid down, that the son should not be deprived of his relationship with his own father and of that own father's name, unless some condition has arisen by the

conduct of the father or otherwise which makes it imperative for the best interest of the child that such action be taken. I think the decree of the lower court should be reversed.

On Motion for Modification of the Opinion, the following was filed *per curiam*:

Appellant has filed a motion for modification of the opinion in this case. The Court has considered the motion and it is denied. In addition to the motion, appellant filed certain reasons therefor which are couched in such intemperate and impertinent language that the Court unanimously feels that the motion and such reasons should be expunged from the record of this case, and it is hereby ordered that this be done.