SHETLER ET UX. *v.* FINK

[No. 269, September Term, 1962.]

*Decided April 11, 1963.*

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT, HORNEY and SYBERT, JJ.

*Waldo Burnside* for the appellants.

No brief and no appearance for the appellee.

HORNEY, J., delivered the opinion of the Court.

In this adoption proceeding, the only question on appeal is whether the consent of the natural father was withheld contrary to the best interests of the child.

When John W. Shetler petitioned for the adoption of his six year old step-daughter Carrie Lynne, the natural mother (Martha L. Shetler) joined in the petition, but the natural father of the child (Robert L. Fink) refused to give his consent and filed an answer opposing the adoption.

The natural father and mother of the child were married in September of 1954 while he was in the armed forces. They separated in August of 1959 and were divorced at the initiative of the wife in April of 1960 apparently on the ground of cruelty. But the causes that gave rise to their marital difficulties seem to have stemmed from the inability of the husband to keep steady employment and from what the wife described as his "drinking and extra-curricular activities."

Although the divorce decree was silent as to custody and support, the mother retained custody of and supported the child. She asked for no support from the natural father and he gave none other than the sum of one dollar—a gift to his daughter— which the mother returned to him with the explanation that the child was not allowed to accept gifts of money without her knowledge. Except for a brief period when the child was with the mother in Washington, D. C., where she had secured employment as a secretary, the child stayed with the maternal grandparents in Clearfield, Pennsylvania, until the remarriage of the mother.

The mother and step-father were married in September of 1960 and reside in an apartment in Hyattsville. Carrie Lynne came to live with them immediately after the marriage. Since

then two other girls have been born to the mother and step-father. The step-father is regularly employed by the Westing-house Air Arms Division as an electronics technician at Friend-ship, and there is no question as to his financial worth and personal stability. He and his wife have created and maintain a creditable home in which to rear children. The husband is a Roman Catholic and his wife, at present a Lutheran, is preparing to enter his Church. Carrie Lynne was baptized in the faith of her mother and the younger children have been baptized in the faith of their father. According to the mother, Carrie Lynne would be happier if she had the same name and the same religion as the remainder of the family so that she too would be a member of the family rather than a member of the household.

After his military service ceased, the natural father was employed as a policeman in Clearfield from October of 1955 until December of 1958 when he was dismissed for behavior unbecoming an officer. After that he was employed only at doing odd jobs for a few days a week. At the time of the adoption hearing he still had no regular employment and he was earning only about $25 a week.

After the separation and before the divorce, the natural father would stop occasionally to see Carrie Lynne at the home of the grandparents. On some occasions he was allowed to see her. On other occasions he was not. But his mother and sister were permitted to see the child and visit her from time to time. At or about the time of the divorce, the natural father was advised in a letter from the wife's attorney that visitation rights to him and his family would no longer be considered because he had not contributed to the support of his daughter. After the divorce and remarriage of the mother, the natural father never attempted to see or visit the child.

When the adoption proceedings came on for a hearing, the natural father sought to amend his answer to the petition by adding a prayer that he be awarded custody of the child. A ruling on the motion was reserved by the chancellor, and during the course of his examination as a witness, the father seems to have abandoned the idea of wanting custody. He not only conceded that it would be best for the child to remain with the

mother, but even indicated that he would have no real objection to a change in the religious affiliation of the child so long as he could "see her [and] visit with her."

In deciding the case the chancellor stated that it was unquestionably in the best interests of the child that she remain in the Shetler household. But he decided the question—as to whether the conduct of the natural father had been such as to constitute a forfeiture of his parental rights—in the negative. In analyzing the evidence, the chancellor came to the conclusion that "while the father did not pursue the matter of visiting his child with any degree of vigor that would warrant commendation, he received no encouragement on this score from the mother or 'in-laws,' " and that the mother had "adopted a policy that it was worth not receiving any support money to be relieved of any demands for visitation rights." And in his opinion and order denying adoption, the chancellor found that "consent of the father to the adoption was not withheld contrary to the best interest of his daughter" and that his conduct did not justify "a finding that he had voluntarily relinquished his parental rights."

The present statute and rule contemplate that a decree of adoption shall not be granted until a signed and verified statement of consent has been filed in the adoption proceeding unless the court shall have found after hearing that the required consent had been improperly withheld. See Code (1957), Art. 16, § 74, and Maryland Rule D73. Prior to the enactment of the existing statute,[1] the consent of a parent or other interested person (other than a child capable of giving assent) was not explicitly required by statute. In effect, this permitted adoption without consent even over the objection of those entitled to notice under the original adoption statute enacted in 1892,[2] but, in practice, the lower court usually considered the absence of consent on the merits, and this Court rarely ever permitted adoption over the objection of those entitled to notice. See Strahorn, *Changes Made By The New Adoption Law,* 10 Md. L.

---

1. Section 74 of Art. 16 of the Code of 1957 was enacted by Ch. 599 of the Laws of 1947 and was appropriately amended by Ch. 622 of the Laws of 1955.

2. The original adoption statute was enacted by Ch. 244 of the Laws of 1892.

Rev. 20, 38. Now Rule D73 and the statute—Section 74 of Article 16 as amended by Chapter 622 of the Laws of 1955— on which the rule was based, provide that a decree of adoption may be granted without the consent required by law whenever it is found that consent has been "withheld contrary to the best interests of the child."

Since the test as to what is to the "best interests" of the adoptive child necessarily depends on the facts and circumstances in each case, it is necessary to study the cases having some analogy to the case at bar, in order to achieve some insight into what this Court has considered to be for the best interests of the child.

In *Alston v. Thomas,* 161 Md. 617, 158 Atl. 24 (1932), adoption was granted, over the protest of the father, because the child had been abandoned by him and allowed to become a public charge and because he was unable to support his other children without public assistance. In *Connelly v. Jones,* 165 Md. 544, 170 Atl. 174 (1934), the adoption by a great-aunt was refused, upon the objection of the father to formal adoption (though not custody), because the then existing statute was interpreted as meaning that the natural parent should not be deprived of his parental rights against his will except under "extraordinary conditions" which (inasmuch as it was not shown that the father had deliberately failed to support and visit the child) did not exist. In *Lagumis v. Ex Parte Lagumis,* 186 Md. 97, 46 A. 2d 189 (1946), adoption was granted because the natural father had seen his son only once in eleven years or contributed to his support for eight years and because the mother and son (then thirteen) desired adoption by the step-father. In *Atkins v. Gose,* 189 Md. 542, 56 A. 2d 697 (1948), adoption was granted, against the opposition of the mother (who had been divorced for adultery and had remarried), because the taking of the child from the adoptive parents and placing him with his mother in crowded living quarters with step-children and an infant born of the second marriage would remove the adoptive child from a satisfactory environment to an unstable one. All of these cases were decided under the original adoptive statute that had required notice to a parent or guardian but not their consent to the adoption.

In *King v. Shandrowski,* 218 Md. 38, 145 A. 2d 281 (1958), where the adoptive parents had had the care, custody and guardianship of the child for more than three years with the consent of both natural parents and the child had no home and knew no parents other than the adoptive parents, the order dismissing the petition for adoption was reversed without affirmance or reversal and remanded for a determination as to whether the mother (who refused to execute a new consent) and the father (who executed a new consent and then withdrew it) had withheld their consents contrary to the best interests of the child. In *Walker v. Gardner,* 221 Md. 280, 157 A. 2d 273 (1960), where the natural father (who had been convicted of several crimes, had been married four times and had had six children) had never seen his eight-year-old daughter and had never contributed to her support, the decree of adoption was affirmed because "the finding expressly made [by the chancellor], that the adoption would be for the child's best interest, * * * almost necessarily [was] a finding in itself that the withholding of consent was legally unjustified under [§ 74 of Art. 16]." Both of these cases were decided under the new adoption statute which requires the consent of a natural parent unless it has been withheld contrary to the best interests of the child.

While all the facts and circumstances in a case must be considered, the cases, which reached this Court on the merits of the question whether or not adoption should be granted, seem to indicate that willful abandonment, failure to contribute to support, neglect to see or visit, and unfitness of a natural parent, are some of the important factors to be considered in determining whether consent has been injustifiably withheld; and that station in life and financial and religious considerations are of secondary importance. On the other hand, the natural rights of a natural parent that have not been lost or forfeited by his or her acts or conduct must be carefully weighed and considered in deciding the question.

In the instant case, where the acts and conduct of the natural father fell short of showing that he had intentionally abandoned his daughter or relinquished his parental rights to see and visit her, and the child is too young to be consulted as to her wish

or desire, we cannot say that the chancellor, who had an opportunity to see and hear the witnesses, did not exercise his best judgment in deciding the case as he did. No real detriment to the child was shown: instead the facts and circumstances indicate that adoption would tend to promote the wishes of the mother more than it would the best interests of the child.

*Order affirmed; appellants to pay the costs.*