EX PARTE IN THE MATTER OF THE PETITION
OF WILLIS ALLEN JOHNSON AND SADIE
ANNIE JOHNSON FOR THE ADOPTION
OF A MINOR

[No. 134, September Term, 1967.]

*Decided October 10, 1967.*

564

The cause was argued before HAMMOND, C. J., and HOR-
NEY, MARBURY, OPPENHEIMER, McWILLIAMS and FINAN, JJ.,
and RUTLEDGE, J., Associate Judge of the Fourth Judicial Cir-
cuit, specially assigned.

*Elizabeth Tennery,* with whom was *Barnard T. Welsh* on the
brief, for appellant.

MARBURY, J., delivered the opinion of the Court.

On November 12, 1965, appellants, Willis Allen Johnson and
Sadie Annie Johnson, filed a petition in the Circuit Court for
Montgomery County seeking to adopt Karen Virginia Greer,
born out of wedlock to Jo Ann Golden Greer, hereinafter referred
to as the mother. This was followed by the Johnsons' petition
for investigation requesting that the matter be referred to the
Probation Department of Montgomery County for investigation
prior to a hearing. Judge Pugh signed an order on December 14,
1965, requiring the investigation to be made. After a hearing on
November 23, 1966, he awarded the child's custody to the peti-
tioners pendente lite. This was followed by an amended peti-
tion for adoption which was authorized by Judge Pugh's order
of December 7, 1966.

The amended petition in substance alleged that the petition-
ers, Willis Allen Johnson and Sadie Annie Johnson, were forty-
one and forty years of age, respectively, that they were married
in January 1943; that four children were born of this marriage,
aged twenty-one, eighteen, sixteen, and eight, and that the two
younger children resided in the home of the petitioners; that
Mr. Johnson had been employed by the Board of Education
for over eight years and received a bi-monthly net salary of $178
and that Mrs. Johnson had been employed by the Board of Edu-
cation for over four years at a bi-monthly salary of $98.50.

It alleged that Karen Virgina Greer was born on February

15, 1964, in the State of Maryland to Jo Ann Golden Greer; that the child's birth certificate recites that one Claude Greer is the father of the child; that petitioners have no information with respect to whether said child was born out of wedlock, or whether the said Jo Ann Golden Greer married Claude Greer or entered into a common law relationship with him; that the child's mother presently resides in Rockville, Maryland, while the whereabouts of Claude Greer is unknown to the petitioners.

The petition further alleged that for a period of one month, commencing in March 1964, the mother employed the petitioners' daughter, Beatrice Ann Johnson, to baby sit for said infant child in the home of the petitioners for the sum of $10 per week between the hours of 10:00 a.m. and until approximately midnight, when the mother took the child home with her until the following morning; that thereafter the mother ceased to return to pick up the child but permitted her to remain in the home of the petitioners, where she continued to be until the petition was filed; that since March 1964 or thereabouts, the mother had only visited the child for a short time on approximately five occasions and had contributed nothing toward her support or medical expenses; that petitioners have had the complete care, control and custody of the child since some time in June 1964 without any contribution being made by the natural mother for clothing, food, shelter or medical expenses, all of which amounts to wilful abandonment of the child by her natural mother; and that the consent of the mother was unnecessary under these circumstances.

It was further alleged that the petitioners were informed that the mother had six children by a previous marriage or common law relationship, three of whom were in foster homes and that she recently gave birth to another child out of wedlock, and further that the mother received assistance from the Welfare Board of Montgomery County; and that the petitioners believe it to be to the best interests of the child to be declared their adopted daughter and to have her name changed to Karen Virginia Johnson.

A second hearing in this case was held by Judge Pugh on February 15 and 16, 1967, after which, on the latter date, he signed an order dismissing the petition for adoption and or-

dered the child returned to its natural mother, whereupon this appeal followed. Here, the appellants contend that as it was found that the child was illegitimate, she could be adopted without the consent of her natural mother, since the child was abandoned, thus negating the necessity of her consent and that it would be to the best interests of the child to be adopted by the petitioners.

The facts disclosed at the last hearing were: the present Mrs. Helsel, the mother, was married to Theodore Manis in 1953 and from that marriage until they were divorced in 1963 she had by him six children. Karen was born in February of 1964, the illegitimate daughter of Claude Greer. When Karen was about six weeks old she was taken by her mother to the home of the Johnsons where she was to be cared for during the day by Beatrice, their teenage daughter, for approximately $7 per week. This arrangement continued for about four months, whereupon payments were discontinued and the mother ceased to pick up Karen in the evenings. This situation existed until the time of the second hearing and during this period the mother saw her child on but one occasion when she kept Karen overnight in her apartment in Rockville. On the following day Mr. and Mrs. Johnson went to the mother's home and requested that they be permitted to take Karen to a doctor with whom they had previously made an appointment. They did not return Karen to the mother but kept her in their home. Some time thereafter the mother consulted the State's Attorney with reference to obtaining custody of Karen and was referred to the police. She went with the police to the Johnson home seeking to recover Karen but was told that she was not there but visiting neighbors.

While Karen was being cared for by the petitioners the mother gave birth to a second child out of wedlock as the result of a union with John Michael Helsel, to whom she was subsequently married on December 30, 1966. The mother and her then husband were living in an apartment in or near Rockville where Mr. Helsel was employed as a driver for Ace Wrecking Company at a salary of approximately $4,000 per year. Mr. Helsel testified that he was desirous of taking over the responsibility and care of all of his wife's children, including Karen,

and to this end three of her boys had been sent to the home of the mother's parents in Tennessee. Mr. Helsel hoped to be employed and to take up permanent residence in Tennessee. He also stated that he desired to take the three of his wife's daughters by her former marriage out of foster homes in Montgomery County where they been placed, and was willing to support them.

A careful review of the record before us, including the testimony taken at the last hearing together with the report of the Department of Parole and Probation, made at the request of the petitioners, convinces us that the chancellor had ample evidence, both from the testimony of the witnesses whom he heard testify in open court and the report made as the result of the investigation by the Probation Department, to support his findings. He found first, that the child was illegitimate; second, that the consent of the natural parent was necessary for the adoption of such a child unless the parent had voluntarily relinquished her parental right of consent or had abandoned the child; third, that there had been no such voluntary relinquishment or abandonment on the part of the mother in this case; and fourth, that the best interests of the child would be served by allowing the natural mother to have custody of her child.

We think the chancellor was correct when he found that the child had not been abandoned by its mother. As stated for the Court by Chief Judge Prescott in *Logan v. Coup,* 238 Md. 253, 257-58, 208 A. 2d 694:

> "From a reading of our previous decisions and the authorities elsewhere, it may be safely said that 'abandonment,' as used in said Section 74 (b) [74 (d)], imports any wilful and intentional conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child, and to renounce and forsake the child entirely. 2 Am. Jur. 2d, *Adoption,* § 32; Annotation 35 A.L.R. 2d 662; 2 C.J.S., *Adoption of Children,* § 21 (d). Compare *Connelly v. Jones,* 165 Md. 544; *Lagumis v. Ex Parte Lagumis,* 186 Md. 97; *Shetler v. Fink, supra* [231 Md. 302], and the cases cited therein."

Karen was originally placed in the Johnson home during the daytime to be cared for by their teenage daughter in order that the mother might work. For the period of approximately four months the mother took the child to her place of abode overnight and paid for its care. The record is not clear as to why the mother ceased paying for its care (possibly due to unemployment) or why she ceased taking the child to her home in the evenings. She did in July 1964 take Karen to her home overnight but the next day permitted the Johnsons to take her to a doctor with whom they said they had made an engagement previously. The Johnsons did not return Karen to her mother but kept her themselves, although the mother, with the aid of the police, sought to recover her child. The second illegitimate child was born to the mother in August 1965. It is reasonable to assume that at least during a part of her pregnancy with this child the mother was unable to be employed and could with difficulty care for Karen. Whatever the financial and physical difficulties faced by the mother between the time when she ceased to return Karen to her home overnight and the time of the filing of the Johnsons' petition for its adoption in November 1965, it is clear that the mother during this period did not relinquish or surrender her parental rights to Karen, but evinced the desire to have her own child and not to surrender it for adoption.

In the instant case the evidence showed that while the mother had previously been unable to assume the full care and custody of her infant daughter she was then in a position to do so. She had remarried and her husband was regularly employed and professed a willingness to care for all of the mother's children as his own. According to the report of the Probation Department she had sought the assistance of and had cooperated with the Protective Services division of the Montgomery County Welfare Board and for some time prior to her remarriage had been in contact with the counsellors and workers of that agency. The report recommended against the adoption. Both she and her new husband seemed to have an earnest desire to establish a home for the children, either in Maryland, or in Tennessee, where the mother's parents resided and to that end had taken the active steps of seeking employment in Tennessee and send-

ing three of the mother's children by her former marriage to Tennessee.

While it is not the controlling factor in custody and adoption cases, the natural rights of the parents are to be carefully guarded and they will not be deprived of their children unless they have forfeited their rights by their own acts or conduct or by voluntarily consenting to the custody of their children being vested in some third party unless the best interests of the child dictate to the contrary. *Watson v. Dockett,* 229 Md. 63, 181 A. 2d 461; *Walker v. Gardner,* 221 Md. 280, 157 A. 2d 273. To this end the Legislature has enacted Code (1957), Article 16, Section 74 providing that the consent of the natural parents of a child must be obtained before said child may be adopted unless the court finds that such consent is withheld contrary to the best interests of the child.

We cannot say that the chancellor erred in failing to find that consent to the adoption of the child was withheld contrary to Karen's best interests nor that he erred in finding that those interests would be best served by denying the adoption and ordering the return of the child to the custody of its natural mother.

> *Order affirmed, appellants to pay the costs.*