## EX PARTE ANDERSON ET UX

[No. 98, October Term, 1951.]

*Decided February 8, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON and MARKELL, JJ.

*Charles W. Main,* with whom was *Charlotte W. Main,* on the brief, for appellant.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from the denial by Judge France, in the Circuit Court of Baltimore City, of a petition filed by Edmund Anderson and Dorothy C. Anderson, appellants, for the adoption by them of a minor, James Edward Simpson, born December 18, 1945.

The material allegations of the petition filed November 9, 1949, follow. The child is illegitimate and has been cared for in appellants' home since October 12, 1946. The mother has not been able to support and maintain the infant, but was unwilling to sign a consent for the adoption of the child until a short time before the filing of the petition in this case. The child has been registered with the Welfare Department since birth. The petitioners are financially able to properly support, care for, maintain, and educate said minor. The petition alleges that it will be for the best interest and will promote the welfare of the minor to be adopted by the petitioners. The consent to the adoption had been in the possession of the Welfare Department for a few months prior to the filing of the petition. The petitioner, Edmund Anderson, is employed as a welder by the United States Coast Guard and earns about $64.00 per week. The petitioners ask for adoption, that the name of the child be changed to James Charles Anderson, and for other and further relief. From an order denying the petition, appellants appeal. Code 1947 Supplement, Article 16, Section 85Q.

From the record, it appears that the petition in this case was first presented to Judge Warnken, who suggested that an investigation be made by the Probation Department. Code 1947 Supplement, Article 16, Section 85-I. A recommendation was then made by the Department of Public Welfare and at the time the case came before Judge Moser he had that report which concluded that the petitioners were not suitable adoptive

parents for the infant. Judge Moser then held a hearing on March 23, 1950, on the petition.

It appears that Mr. Anderson is about 42 years of age and Mrs. Anderson 48 years old. He had been operated on for a peptic ulcer and seemed to have recovered and was back at work. Mrs. Anderson has a goiter and is of a nervous temperament and "gets upset very easily". At the time of the hearing the child had been placed in another boarding home, having been taken from the petitioners' home in July, 1949. He was delivered to the petitioners in October, 1946, when about nine months old. At the time he was placed with the petitioners he had had a physical examination and was reported in "satisfactory health". Shortly after being placed with petitioners he developed "a bad chest cold". The doctor recommended a change of diet. The child was circumcised in March, 1947. The supervisor of the case, Mrs. Bertha Hollander, of the Welfare Department, said: "The agency had questioned about the way the child was developing, and in the *interim* the mother had signed an adoptive release—for him, and because of our question about the amount of dependency he was growing up with, and concern about having a child who could be adopted, and in view of the age of Mr. and Mrs. Anderson and certain questions about their health, that their age and relation to the child I should say that this child was just not going to get the best chance of growing up, and it would be unsafe for him to remain in that home, and I guess we take pretty seriously the adoptive plan for a child, a growing up plan, and it just did not seem sound to us although we had no question of their affection for the child." There was no question about the deep affection that grew up between the petitioners and the child. The report from the medical and psychological section of the Welfare Department showed: "Separation between Jimmie and his long time care foster parents was extremely painful to the three of them. He cried with homesickness for quite a long time, and showed plainly his grief at this change but he was able to come

through from all this without being destroyed. He is a different little boy now. He feeds himself. He dresses himself, attends to his toilet needs, and goes upstairs and downstairs by himself. Previously all this was done for him. This foster mother was firm in her belief from the beginning of placement and Jimmie himself knows this home was different from his past one. It was an abrupt change for Jimmie. He has a lot of inner strength, and he was able to meet this rigidness of his foster mother, and now likes—From a shy, unhappy child he has developed into a friendly little boy. He is a very affectionate and responsive child, and needs to be loved. His foster mother gives Jimmie the degree of affection he needs. * * * He looks happy and Jimmie can establish a very warm relationship in time. This is not a superficial kind but one that goes deep. He appears more intelligent than his test results, and has a good memory, and expresses himself clearly and freely. His speech is not distinct but can be understood. * * * He remembers his previous foster home but remembering it now does not upset him. He speaks of his former foster parents but understands he will not be returned there. * * *" The mother of the infant accidently drowned in July of 1950.

Judge Moser at the end of the hearing said: "I have taken longer with this case than any other adoption case since I have been here in this court, and I have because I was very much impressed with the affection displayed by these parties for the infant in question, and I was further very much impressed with Mr. Anderson as a person, as I said in court last time, impressed to such an extent that although the Welfare Department, which had very close and intimate knowledge of the Andersons and of the child sought to be adopted, had strongly recommended against adoption, so I did two things. I first asked them to re-consider the situation, go over the files and re-consider the whole picture. They did, and they sent me a communication which I have shown to counsel, and which I want marked and made part of the records

of the case, in which they again state that they could not recommend that the Court sign the adoption papers, and reaffirmed their position in the matter. I was not satisfied with that, and when I say 'not satisfied', that perhaps is not quite the right word. I was hoping to get a different answer because of my natural feeling about these parties and my natural feeling that the affection which was displayed was entitled to a reward, let us say—and I sent the matter to the Probation Department, and I indicated to the Probation Department I wanted them to make a complete and independent inestigation, ignoring as much as possible—not the facts but the conclusions reached by the Welfare Department. The Probation Department did that, and they filed this report which counsel have seen and which has been marked, and they cannot recommend to the Court that these adoption papers be signed. In view of that and regardless of my personal feelings, and in view of the obligation which I have to the child I am very reluctantly and regretfully declining to sign the petition for adoption, so I will have to refuse to sign the adoption papers." The report of the Welfare Department, referred to by Judge Moser and signed by Director Waxter follows: "Dear Judge Moser: In accordance with your request, following the court hearing on Thursday, March 23rd, this Department has carefully reviewed its records of James Simpson and of Mr. and Mrs. Edmund Anderson. We once more find it our considered opinion that, despite the love that Mr. and Mrs. Anderson have for this child and the loss that results for them in such a decision, it is in Jimmy's best interests that he has been removed from this home. We believe that a more suitable home can and should be selected for him as the permanent adoptive home of which he is now in need. James was committed to the Department of Public Welfare of Baltimore City, Division for Juvenile Causes. The Department placed James with Mr. and Mrs. Anderson from October 2, 1946 until July 21, 1949, on a boarding basis. Mr. and Mrs. Anderson had applied to us to board chil-

dren, and their home was studied, approved, and licensed as a boarding home. They boarded another of our children from July 19, 1947 to May 17, 1949. We paid our prevailing rate for board at all times, supplied clothing, incidental expenses, and carried full responsibility for medical care. With Jimmy, as is true with any other child whom we place with foster parents on a boarding basis, we could at no time offer any assurance to Mr. and Mrs. Anderson that Jimmy would be remaining with them throughout his minority. If Mr. and Mrs. Anderson had applied to us for a child whom they could adopt, our study of their home would have been very different. Such factors as age and health would have had more significance. We require a more thorough physical examination for adoptive than for boarding parents. Also we would have considered the family's ability to carry full responsibility for the child, since the agency would be withdrawing from the situation in a relatively short period. In a boarding home we continue to carry responsibility for the child as long as he is there through supervision, and we are always available to the foster family for help with the child. Our increasing concern that Mr. and Mrs. Anderson were failing to meet Jimmy's growing needs was more sharply focused when Jimmy's mother, who had first wished a boarding plan for him, decided to release him for adoption and signed a release on August 17, 1948. We reached a decision to remove Jimmy from the home in May, 1949, but delayed action because of Mr. Anderson's illness at that time and our wish not to add to the strain the family was under. Our decision to move Jimmy was based in largest measure on the unsatisfactory development that he was showing. Jimmy was being protected and kept dependent. Mrs. Anderson was treating him as a little baby, dressing him, feeding him, keeping him indoors all the time so he would not get hurt, or get in trouble with other children. Jimmy spent most of the time sitting in Mrs. Anderson's lap, or watching television. He was given no opportunity to learn how

to play, share, or get along with other children. From the point of view of health, we question Mrs. Anderson as a suitable adoptive parent for Jimmy. Mrs. Anderson has an inoperable goiter, which her doctor has told us makes her very high strung at times. We believe this emotional unevenness unfavorably affects the care which she has given to our children. After careful review, we continue to believe that Mr. and Mrs. Anderson are not suitable adoptive parents for Jimmy, nor the parents with whom he would get as good a chance in life as we could find for him. We are unwilling to give our consent to this adoption."

Of course, in adoption cases such as the one before this Court, where the child had no natural parents, the primary interest of the courts is the best interests and welfare of the child. Code 1947 Supplement, Article 16, Section 85A. This Court has said many times that the welfare and best interest of the child is the primary consideration. *Haney v. Knight,* 197 Md. 212, 218, 78 A. 2d 643, 646, and cases there cited.

After Judge Moser refused to sign the adoption papers, the case was referred to Judge France, who signed an order denying the petition with the notation "see letter of June 6, 1951, from Dept. of Welfare." That letter of June 6, 1951, follows: "Hon. Robert France, Judge, Supreme Bench of Baltimore, Court House, City, Dear Judge France: Recently, there appeared before you the adoption petition filed on behalf of Edmund and Dorothy C. Anderson for a child, a five year old boy, James Edward Simpson. I am informed that following the presentation of the matter by Mr. Charles W. Main, attorney for the prospective adoptive parents, you were kind enough to suggest that the matter be discussed with me. In accordance with the above, I have not only discussed the matter with Mr. Main but have gone over the whole situation with our staff in the Children's Division of the Department of Public Welfare. It is still our best judgment that this would not be a good adoption. We believe that we can find an adoptive home

for this child which will better meet his needs than the home of Mr. and Mrs. Anderson. We now have the child in a regular foster home because we do not want to make any commitments as to adoption as long as any proceeding was pending before any of the Courts relative to this child. In coming to the conclusion that the adoption is not in the best interests of the child, I want to make clear that we are not making any statements or inferences against the character or standing of either Mr. or Mrs. Anderson. The difficulty in situations like this always is that the petitioners feel that unless there is some reflection on their character or behavior that the adoption should go through. Any one opposing the adoption, therefore, is placed in the position of perhaps casting some reflection upon the character of the petitioners. This makes the whole matter difficult. The simple truth in this situation is that the Welfare Department is genuinely convinced that the adoption is not in the best interests of the child in terms of the needs of the child himself and in terms of other homes that are available. However, should it be the decision of the Court to carry through the adoption by Mr. and Mrs. Anderson, the Welfare Department will, of course, co-operate in the matter in every way. I should be only too glad to have the opportunity to discuss this with you at your convenience, should you feel that this would be helpful. Sincerely yours, T. J. S. Waxter, Director, Department of Public Welfare."

In the brief filed in this Court, counsel for the appellants state: "It is the duty of the Court to determine whether or not an adoption is for the best interest of the infant involved. In the instant case, no testimony was heard by Judge France. The pleadings were presented to him and he informed the solicitors for the Petitioners that he deemed it advisable for the solicitors and the Welfare Department by Thomas J. S. Waxter, its director, to confer and that thereafter, Mr. Waxter should inform the Court of the Welfare's position in the adoption matter. That on the 6th of June, 1951, after

a conference of the Petitioners' Solicitors and Mr. Waxter, a letter fully set forth in the appendix was forwarded to Robert France, Judge. Whereupon, on the 12th day of June, without any further investigation, his Honor, Judge France, dismissed the Petition for adoption." In the argument in this Court, Mr. Charles W. Main, as counsel for appellants, stated that Judge France denied him the opportunity to present additional evidence in the case. No proffer was made of such evidence and nothing appears in the record in this Court to substantiate this statement. This Court is of opinion that the petition should be affirmed without prejudice to the right of the appellants to petition to reopen the case if it can be shown, as stated by Mr. Main, that he was denied opportunity to present additional evidence.

*Order affirmed, without prejudice, costs to be paid by appellants.*