KING ET UX. *v.* SHANDROWSKI

[No. 9, September Term, 1958.]

*Decided October 24, 1958.*

The cause was argued before BRUNE, C. J., and HENDER-SON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Edward J. Bagley* and *Ernest A. Loveless, Jr.,* with whom were *Oscar R. Duley, Duley & DeBlasis* and *Loveless & Bagley* on the brief, for the appellants.

*Jerrold V. Powers,* with whom were *Sasscer, Clagett & Powers* on the brief, for the appellee.

HORNEY, J., delivered the opinion of the Court.

The Circuit Court for Prince George's County denied the petition of Bernard Anthony King and Evelyn May King, his wife, (the Kings *or* adoptive parents), for the adoption and change of the surname of Judith Lynn Williams (Judith *or* adoptive child), dismissed the petition and awarded the custody of the adoptive child to Norma Shandrowski (the natural mother). The adoptive parents appealed.

The natural mother quit school at the age of fourteen and took employment as a cafeteria waitress. When she was seventeen she was married to her first husband, who lived

with her for one week and left. After the lapse of more than a year she went to Nevada to secure a divorce. While there she met Alan G. Williams and married him after the divorce from her first husband had been granted in January of 1951. The natural mother returned to Washington with her second husband, where they lived together off and on until the early part of 1954, when they finally separated. Prior to the final separation there had been several other separations and reconciliations. A boy had been born to the Williamses in May of 1952, and a girl, Judith, was born in November of 1953. After the final separation of the parents—when Judith was about six months old—the natural mother went to live with a sister and took the children with her. Shortly thereafter, and from time to time, she placed both children in various foster and nursery homes while she worked to support them. One such foster home was that of the Kings. Finally, through a series of circumstances, Judith again came into the home of the Kings in the latter part of 1954, where she resided until after the hearing on the adoption petition.

Shortly after the last placement with the Kings, Judith became very ill as a result of chronic diarrhea and had to be hospitalized. The hospital bill was paid by the natural mother's family, but the doctor's bill was paid by the Kings. Judith recovered from her illness and at the time of the hearing had developed into an attractive, healthy and normal child. The Kings agreed to keep her free of charge, which they did. She lived in their home as a part of the family. She knew no other home, and she knew no other parents than the Kings and considered them to be her father and mother.

In September of 1954 the natural mother left Washington and went to reside with another sister in Syracuse, New York. She returned to Washington for a visit at Christmas time in 1954. While there she met the Kings and stated that she was still unable to care for Judith. Her earnings had been and were then meager and remained so for sometime thereafter. The Kings agreed that they would keep the child and rear her if the natural mother would cease seeing her. The mother never saw the child again until the first day of the hearing. In April of 1955 both natural parents executed

formal written consents to the adoption of Judith by the Kings. Apparently both natural parents were under the impression that the adoptive parents had obtained a decree of adoption promptly. The Kings, however, had delayed filing a petition for adoption until the fall of 1957. When they employed counsel to institute the adoption proceeding they were advised that the period of time within which they could file a petition under the original consents of the natural parents had expired.[1] The Kings requested both natural parents to execute new consents. At first the natural mother indicated that she would do so, but subsequently changed her mind and advised the adoptive parents that she wanted Judith returned to her. The natural father executed a new consent, which was filed in the adoption proceeding, but he revoked it on the second day of the hearing in the lower court stating that Judith should be "reared by her natural mother in the same family unit as her [whole] brother." There is nothing in the record to indicate that the revocation of consent by the natural father in anyway affected the decision of the chancellor.

The natural mother eventually obtained a divorce from her second husband and subsequently married Walter J. Shandrowski, by whom she had another boy. The fitness of the adoptive parents as well as the natural mother was not questioned, and was not an issue in this case.

The chancellor, after a hearing in open court, decided that the natural mother had not wilfully or intentionally abandoned the adoptive child, and awarded the custody of the child to the natural mother. We are unable to rule that the

---

1. Code (1957), Art. 16, § 75, provides that notice need not be given to parties who have formally given their consent to an adoption within one year of the filing of the petition. Prior to June 1, 1955, a party who had formally given consent to the proposed adoption was held to have waived the requirement of notice. See Code (1951), Art. 16, § 83. Chapter 622 of the Acts of 1955 rewrote the section and provided a 90-day period within which the petition had to be filed after consent had been given. Chapter 308 of the Acts of 1957, substituted one year for ninety days.

chancellor was clearly wrong when he found that the natural mother had not abandoned the adoptive child. Maryland Rule 886 a. We think it is apparent, however, that the chancellor based his decision on the assumption that the statute [Code (1957), Art. 16, §§ 74 and 75] precluded him from decreeing adoption of the child by the adoptive parents because the natural mother refused to execute a new consent. There is nothing in his opinion to indicate that the chancellor gave any consideration to the more important question concerning the best interests of the child. Section 74, *supra*, in addition to providing for the formal execution of written statements of consent, specifically provides that "* * * the court *may grant a petition* for adoption *without any of the consents* * * * [therein] specified, *if*, after a hearing the court finds that *such consent* * * * [*is*] *withheld contrary to the best interests of the child*." [2] (Emphasis added).

In a case such as this where the adoptive parents have had the care, custody and guardianship of the adoptive child for more than three years with the consent of both natural parents, and the child has had no home and known no parents other than the adoptive parents, we think it is clear the statute requires that the chancellor must find, after a hearing, whether the refusal of a parent to execute a new consent, as is contemplated by § 75, *supra*, is withheld contrary to the best interests of the child. The test, of course, depends on the facts and circumstances in each case. *Atkins v. Gose*, 189 Md. 542, 549, 56 A. 2d 697 (1948); *Lagumis v. Ex Parte Lagumis*, 186 Md. 97, 102, 46 A. 2d 189 (1946). See also Strahorn, *Adoption in Maryland*, 7 Md. L. Rev. 275, 298 (1943). For cases which considered the "best interests" principle in adoption cases see *Ex Parte Frantum*, 214 Md. 100, 103, 133 A. 2d 408 (1957), *Ex Parte Anderson*, 199

2. Chapter 622 of the Acts of 1955 substituted this last sentence in the first paragraph of § 74, *supra*, for the last clause in the first paragraph of Code (1951), Art. 16, § 82, which read as follows: "* * * but in no event shall an interlocutory or final decree of adoption be made without having the consents required by this section unless for reasons satisfactory to the court, it shall appear proper to dispense therewith."

Md. 316, 322, 86 A. 2d 516 (1952), *Haney v. Knight,* 197 Md. 212, 218, 78 A. 2d 643 (1951), *Anderson v. Barkman,* 195 Md. 94, 97, 72 A. 2d 709 (1950), *Atkins v. Gose, supra,* at p. 548, *White v. Seward,* 187 Md. 43, 47, 48 A. 2d 335 (1946), *Lagumis v. Ex Parte Lagumis, supra,* at p. 102, *Waller v. Ellis,* 169 Md. 15, 25, 179 A. 289 (1935), and *Alston v. Thomas,* 161 Md. 617, 620, 158 A. 24 (1932). Since the "best interests" theory is the same as that which is used as a guide in deciding custody cases, see also *Ross v. Pick,* 199 Md. 341, 351, 86 A. 2d 463 (1952), and *Pitts v. Pitts,* 181 Md. 182, 192, 29 A. 2d 300 (1942).

We have repeatedly held, as have the courts in other jurisdictions where the statutes are similar to ours,[3] that the primary consideration in adoption cases should be the best interests of the child. As was so well said for this Court by Judge Prescott in the recent case of *Winter v. Director,* 217 Md. 391, 143 A. 2d 81 (1958), at p. 395:

> "The state as *parens patriae* and the protector of its inhabitants has, under proper circumstances, the power to change the status of a minor *without the consent of the parent.* While the natural rights of parents should be carefully guarded, *the welfare and best interests of the child are the primary considerations in all adoption proceedings."* (Emphasis added).

See also *Ex Parte Frantum, supra,* at p. 103, *Ex Parte Anderson, supra,* at p. 322, *Waller v. Ellis, supra,* at p. 25, and *Alston v. Thomas, supra,* at p. 620. Cf. *Connelly v. Jones,* 165 Md. 544, 170 A. 174 (1934).

It appearing that further proceedings are required, we will neither affirm nor reverse the order from which the appeal was taken. See Maryland Rule 871 a. Instead we will remand the case to the end that the chancellor may make a find-

---

**3.** For comparable decisions in other jurisdictions see *Cooper v. Hinrichs,* 10 Ill. 2d 269, 140 N. E. 2d 293 (1957), and *In re Clough,* 28 Ariz. 204, 236 P. 700 (1925). Cf. *In re Davies' Adoption,* 353 Pa. 579, 46 A. 2d 252, 256 (1946).

44

ing as to whether the consent of the natural mother (and as to the natural father, too, since he has revoked his new consent) is withheld contrary to the best interests of the child. In so doing he should require such investigation, report and recommendations,[4] and cause the production of such further testimony and documentary evidence, as may be necessary for the purpose of making the further findings referred to above. The investigation should include an inquiry into the health, happiness and general well-being of the child in her present custodial status as a member of the family of her stepfather and natural mother, where she has been since the original hearing in this case.

> *Case remanded for further proceedings consistent with this opinion without an affirmance or reversal of the order appealed from, the costs to abide the result of the further findings of the chancellor.*