Chief Judge Conway.
The purpose of this habeas corpus proceeding is to determine the custody of Laura Neuberger, an infant who is now about five and a half years old. About four and a half years of her short life have been spent in the home of the appellants, Mr. and Mrs. Sanders. Appellants are not related to Laura, nor do they have legal custody. They have her on a temporary foster parent basis pursuant to an arrangement with the respondent Jewish Child Care Association of New York, hereinafter referred to as Child Care.
Child Care is a philanthropic organization chartered by the State of New York to care for children who are in need of *225 custodial care outside of their own homes. It accepts for care children whose parents are temporarily unable to care for them but who are unwilling to place them for adoption. These children are cared for until such time as their own families can properly care for them. While some of these children are placed in a cottage plan institution, the majority are placed in boarding or foster homes. During this boarding period, Child Care’s workers assist those in the natural home in preparing for the return of the child, and at the same time exert efforts to insure the child’s adjustment and preparation for the return to its family. When such a child is placed in a foster home, it is the function of the foster parents to assist in the proper orientation of the child so that it may be prepared and ready for its eventual return to its family. This relationship of foster parent and child is carefully explained to persons who undertake to assist Child Care in its worthy purpose. Such persons are paid an agreed sum of money for the child’s room and board, and clothes and medical care are paid for by" Child Care. Persons accepting such a child for temporary boarding care do so with the understanding that adoption is not contemplated, that the child will return to its natural parent or parents as soon as feasible, and that one of the primary responsibilities of such boarding parents is to prepare the child psychologically for its contemplated return to its natural home. In order to maintain and strengthen the ties between the child and its parent or parents, the boarding program contemplates periodic visits by the natural parent with the child at the boarding home.
It was in this context that on about July 30,1964 the Sanders, husband and wife, accepted Laura into their home having applied to Child Care three or four months previously to serve as foster parents. Laura’s young mother was unable to care for her after her birth and the child was placed with the Department of Welfare of New York City which in turn commended her welfare and custody to Child Care. When Mr. and Mrs. Sanders first applied to Child Care to participate in its boarding program, that program was explained to them and they were expressly told at that time that Child Care was a boarding agency and not an adoption agency. When they took Laura they knew she had a mother who would visit her, although not for a while in the beginning. The precise chronology of the *226 events that followed during Laura’s stay with the Sanders is not clearly revealed by the record. It appears that sometime during1 the first year that they had Laura, the Sanders acquired a desire to adopt her. They mentioned this to one of Child Care’s workers who told them that adoption was out of the question, and explained the necessity for helping Laura to understand who her mother was. Despite this, Mr. and Mrs. Sanders actively sought to effectuate their desire to adopt Laura. In their pursuit of adoption, and contrary to the known policies and rules of Child Care, the Sanders arranged to speak to Laura’s mother about adoption. On several occasions they attempted to persuade Laura’s maternal grandmother and uncle to interfere and intercede in their behalf and prevail upon Laura’s mother to give her up. At one point the Sanders were required by Child Care, as a condition to their keeping Laura, to sign a paper in March of 1957 to the effect that they had Laura on a foster home or boarding home basis only. This occurred after an attorney, representing himself as the Sanders’ attorney, telephoned Child Care and inquired about the availability of Laura for adoption. Some time prior to Thanksgiving Day in November of 1957, Mr. and Mrs. Sanders asked Child Care if they could take Laura to Florida for that holiday. They were refused permission, one of Child Care’s workers explaining to them that by that time Laura might be back with her mother, and that Child Care was working on a plan with the mother toward that end. When thus advised, Mrs. Sanders became upset and she described her emotional reaction as follows: “I was heartbroken, very worried about Laurie, about how she would react. In fact, that was my prime worry, how she would feel being taken away from her mother and father” (emphasis supplied). In their zeal to adopt Laura, the Sanders persuaded Laura’s uncle to discuss his sister’s (Laura’s mother) background with the district supervisor of the foster home department of Child Care. It does not appear what this background was. At any rate the district supervisor then informed the Sanders that they would be asked to give up Laura in a few weeks because they had become too emotionally involved with the child. During approximately a week that followed, the Sanders intensified their efforts to persuade Laura’s mother to surrender her for adoption. Mr. *227 Sanders approached Laura’s mother both at her place of business and at her home, but she steadfastly refused to give up her daughter. He spoke with Laura’s grandmother but she refused again to interfere. Finally, Laura’s mother telephoned Child Care about these efforts. The district supervisor then informed the Sanders that they would have to give up Ladra and that this course would be kinder to them in view of their deep emotional involvement with Laura. When Child Care’s representatives came to call for Laura, however, the Sanders refused to give her up, whereupon Child Care commenced this proceeding. Almost all of the foregoing is based upon the testimony of Mr. and Mrs. Sanders.
The district supervisor of the foster home department of Child Care testified, in part, that Child Care has worked with the Sanders to help them continue to keep Laura while performing their proper function as boarding parents. However, it became evident that the child’s best interests necessitated her placement in another environment where she would not be torn between her loyalty to her mother and her boarding parents. According to the testimony of a representative of the Department of Welfare of New York City, that department was in agreement with Child Care that Laura’s best interests required that she be placed elsewhere. A psychiatrist, the only witness called by appellants, testified in substance that he had interviewed Laura and the Sanders the afternoon before the trial, that the Sanders took Laura to satisfy their own parental instincts, that Laura is well adjusted, that if she were taken from the Sanders now she might become maladjusted, that the Sanders are the only ones Laura knows as parents, that it would be better to allow Laura’s attachment to the Sanders to grow, and that Laura would make a better adjustment to the change to her own mother later on, whenever that should be, if she were left with the Sanders.
Upon this record, the Supreme Court Trial Justice, who had formerly been a Children’s Court Justice for 11 years, found that it would be in Laura’s best interests if she were taken from the Sanders before, as he phrased it, “further damage is done or a still more difficult situation for her is created This discretionary finding was expressly affirmed by the Appellate Division. There is no merit to the appellants’ claim that *228 the Trial Justice failed or refused to exercise independent discretion as to what is in Laura’s best interests, or that he made his determination upon any basis other than her best interests. Consequently, the precise question which this record presents is whether there is such a lack of supporting evidence that we must charge the court below with an abuse of discretion as a matter of law. (See Matter of Bachman v. Mejias, 1 N Y 2d 575, 582; People ex rel. Kropp v. Shepsky, 305 N. Y. 465, 468; People ex rel. Portnoy v. Strasser, 303 N. Y. 539, 542; Bunim v. Bunim, 298 N. Y. 391, 393.) It should be remembered that “ Questions of custody are, generally, for the Supreme Court, in its discretion, and it is rarely that any such determination by it can raise any question of law for us.” (People ex rel. Portnoy v. Strasser, supra, p. 542.)
In considering what is in Laura’s best interests it was not only proper, but necessary, for the Trial Justice to consider the facts in terms of their significance to Laura’s eventual return to her own mother. The record permits no other perspective to be taken, both in view of Laura’s mother’s steadfast refusal to give her up, and Child Care’s declared purpose to return Laura to her own mother when she is able to care for her. Viewing the record thus, it supports in a most compelling manner the Trial Justice’s determination which has been affirmed by the Appellate Division. It clearly establishes that the appellants have conducted themselves in a fashion inconsistent with their agreement and, indeed, diametrically opposed to their trust. Their own witness testified that Laura had come to look upon appellants as her parents, “ the only ones she has known as parents.” In short, the content and tone of the record disclose a situation in the Sanders home which has reached such a peak of emotion and possessiveness that it is entirely inconsistent with Laura’s future with her own mother, and her need to be prepared for that future. Certainly, the Trial Justice was entitled to find that it would be in Laura’s best interests to extricate her now from the emotional entanglement into which she has been plunged by the keen parental desire of the Sanders in which they involved themselves contrary to their own agreement and in violation of their trust. He was entitled to find that to allow Laura to stay longer would make the future transition to her own mother more painful for the child.
*229 That the Sanders have given Laura a good home and have shown her great love does not stamp as an abuse of discretion the Trial Justice’s determination to take her from them. Indeed, it is the extreme of love, affection and possessiveness manifested by the Sanders, together with the conduct which their emotional involvement impelled, that supplies the foundation of reasonableness and correctness for his determination. The vital fact is that Mr. and Mrs. Sanders are not, and presumably will never be, Laura’s parents by adoption. Their disregard of that fact and their seizure of full parental status in the eyes of the child might well be, or so the Trial Justice was entitled to find, a source of detriment to the child in the circumstances presented. Nor can we sustain an objection that, since the child is not now being returned to her mother, she should be left with the Sanders because the fitness of her next habitation is presently unknown. As the Appellate Division wrote, we may not indulge an assumption, or even harbor a doubt, that Laura will not be properly eared for under the supervision of Child Care which is an authorized agency and which has proven itself most solicitous for the welfare not only of the child and its mother but even of the appellants themselves. From the standpoint of the child’s best interests, therefore, we hold that there was no abuse of discretion by the Trial Justice.
The nature of this case requires one further basic statement. What is essentially at stake here is the parental custodial right. Although Child Care has the present legal right to custody (Social Welfare Law, § 383, subd. 2) it stands, as against the Sanders, in a representative capacity as the protector of Laura’s mother’s inchoate custodial right and the parent-child relationship which is to become complete in the future. Any future physical legal custody in Laura’s mother would be but an empty right, if the emotional substance of that relationship were permitted to be replaced antecedently by the parent-like love and possessiveness of Mr. and Mrs. Sanders. This court has acknowledged that “ * * * the right of a parent, under natural law, to establish a home and bring up children is a fundamental one * * (People ex rel. Portnoy v. Strasser, 303 N. Y. 539, 542, supra.) In support of this tenet we have declared that “ Except where a nonparent has obtained *230 legal and permanent custody of a cMld by adoption, guardianship, or otherwise, he who would take or withhold a child from mother or father must sustain the burden of establishing that the parent is unfit and that the child’s welfare compels awarding its custody to the nonparent.” (People ex rel. Kropp v. Shepsky, 305 N. Y. 465, 469, supra.) A proper application of these doctrines requires the conclusion that foster parents may not succeed in a proceeding such as this, where the child temporarily in their care is to return to its natural parent, in accordance with the trust accepted by the foster parents for compensation, in the absence of a clear showing that to return the child to the boarding agency will operate to its grave detriment. The paramount parental right to raise one’s own child, which we regard as fundamental, is to be protected not only from direct and immediate incursion, as in the Shepsky and Strasser cases, but also from indirect and less proximate subversion, such as in the case before us.
We are, of course, not unmindful that the result we reach may cause distress to the appellants. However, the more important considerations of the child’s best interests, the recognition and preservation of her mother’s primary love and custodial interest, and the future life of the mother and child together, are paramount. These interests, and the program of agencies such as Child Care which preserves them, may not be subverted by foster parents who breach their trust.
The order of the Appellate Division should be affirmed, without costs.