428 S.W.2d 18 (1968)
In the Interest of I. M. J., a minor under the age of seventeen years.
No. 8664.
Springfield Court of Appeals, Missouri.
April 26, 1968.
*19 Jack L. Koehr and Deeba, DeStefano, Sauter & Herd, St. Louis, for appellant.
Ted M. Henson, Jr., Poplar Bluff, for respondents.
HOGAN, Presiding Judge.
This case involves the custody of I.M.J., a little girl seven years old, who was declared a neglected child in November 1963 by the Juvenile Court of Butler County. The court made I. its ward and placed her in custody of her mother's aunt and uncle, Mr. and Mrs. T. This proceeding represents the second attempt by F., the child's mother, to regain custody. F. has appealed from an adverse ruling, as provided by § 211.261, RSMo (1959), V.A.M.S.
I. was born December 1, 1960, in St. Louis, where the appellant, then unmarried, was employed. The appellant kept her child there until April 1962, leaving I. with an aunt (appellant's sister) during the time she worked. In April 1962 F.'s brother-in-law "beat and abused" I., and F. was obliged to take her child to her parents' home in Poplar Bluff. F.'s mother had other children at home, her father became ill, and consequently I. was taken to live with her present custodians, Mr. and Mrs. T. As indicated, Mrs. T. is the grandmother's sister. In November 1963, a petition was filed in the Juvenile Court of Butler County, alleging in substance that I. was in need of care and treatment because she had been wilfully abandoned and neglected by the appellant. After a hearing in which F. participated with counsel, the trial court found that I. was an abandoned and neglected child, made her its ward, and formally placed her in the custody of Mr. and Mrs. T. In July 1964, the appellant filed a motion to amend the custody order, setting out that she was able to care for I. and was then a fit person to have custody of her child. A hearing was had on this motion in September 1964, and the cause was taken under advisement "pending the filing of briefs and investigations of the Welfare Department." On February 8, 1965, this motion was denied. On May 17, 1966, F. filed this second motion to amend the custody order, alleging that she had at all times attempted to care for her child; that she had married in June 1965 and was now able to provide a home *20 for I., and that she was a fit and proper person to have the custody of her child. After a hearing on October 25, 1966, the trial court denied this second motion, and F. now appeals.
As material here, the record consists of the testimony of three witnesses: the appellant, her husband, and Mr. T. Mrs. T. was present when the case was called, but became ill, suffering what her physician called an attack of "nervous exhaustion," and was unable to testify. Counsel asked for the opportunity to present Mrs. T.'s evidence at some future date, stating that he believed she was a "vital witness," but the trial court refused and the hearing proceeded.
The appellant's evidence was that she had originally taken I. to Poplar Bluff, as we have indicated, because her brother-in-law had "abused the child and beat her." The nature of this mistreatment is not further disclosed; the appellant did testify that she made a formal complaint at the time, but nothing came of it. "[H]e [the brother-in-law] was booked and held for three hours and the Judge overruled the well he said she wasn't beat bad enough." I. was brought to the grandparents' home, the appellant stated, with the request that they "* * * watch her until I could get a place of my own and get somebody to watch her." When it had subsequently become necessary for I. to go and stay with Mrs. T., F. testified, she had again only "* * * asked them to keep her until I could get somebody to watch her." On several occasions thereafter, the appellant had attempted to get Mr. and Mrs. T. to return her child, but they had refused, and at one point had physically prevented her from taking I. back to St. Louis with her. As a consequence, I. had simply remained where she had been, with Mr. and Mrs. T., and F. had continued to visit the child in her aunt's home. Beginning in February 1965, the appellant had contributed regularly to her child's support. Cancelled checks introduced in evidence by the appellant show that between March 16, 1965, and June 14, 1966, the appellant and her present husband contributed the sum of $650.00 toward I.'s support. There are 36 checks covering this period, all endorsed by Mrs. T.
The appellant further testified that she was living in the city of St. Louis and was regularly employed, but that she would immediately quit working if the court gave her custody of her daughter. She had married one O. in June 1965, and her husband was also employed. At trial time, the appellant and her husband lived in a four-room apartment in south St. Louis. The apartment consisted of a living room, two bedrooms, a kitchen and a bath. One of these bedrooms had been prepared as a nursery, and the appellant introduced several snapshots of the interior of the apartment.
O., the appellant's husband, was 46 years old at the time of the hearing. He was earning $125.00 per week, but felt he would soon be earning more, since he was "planning to buy a filling station." He also testified that F. was his fourth wife. All his previous marriages had ended in divorce. Being asked by the trial court about these divorces, O. stated that "the first one I got. The second one I got was in California, she run off with another man," and on the third occasion "* * * I was getting it [the divorce] but they turned the tables and let her get it." O. has two children of these previous marriages; one is "grown" but O. contributes $50.00 per month to the support of the other. According to O., he not only wanted his wife to have her child but was prepared to adopt I., and had made rather elaborate preparations to receive I. in the event she was returned to the appellant. He had made arrangements to have I. examined by a physician and a dentist, she would be able to attend school "half a block away," and would have a "cyclone fence in the big back yard and a one hundred and fifty dollar dog and her own room." O.'s acquaintance with I. consisted of having seen *21 her "about seven times," apparently in Mrs. T.'s home.
Mr. T. was the principal witness in opposition to the motion. He testified that at trial time he was living in "Galconda (sic), Illinois," about 150 miles from Poplar Bluff. He operated a sawmill in Illinois, but since Mrs. T. had relatives in Poplar Bluff and he came back there "every week or two weeks" to visit, he had considered it unnecessary to ask permission of the court to remove I. out of the jurisdiction. T.'s further evidence was that in May 1962 I. had been left at his home, and in June, F., the appellant, had told him and Mrs. T. that "* * * we could have the kid forever, she never wanted it back but she would like to see it." Mr. T. produced a witness (one of his employees) who had been present when this statement was made. This witness, a Mr. H., said the appellant had told Mr. T. "that she was giving him the child and she expected him to keep her forever." Mr. T. testified that he and his wife wanted to adopt I. and were making preparations to do so when this proceeding was begun. This, generally, is the background of the case, and other facts will be noted in the course of the opinion.
We have considered the arguments of the parties, but we do not find either viewpoint persuasive. The appellant argues that the best interest of a child is promoted when he is placed in custody of a natural parent, and of course in many instances that is true, State v. Pogue, Mo.App., 282 S.W.2d 582, 588 [6-9]; Ex parte De Castro, 238 Mo.App. 1011, 1028, 190 S.W.2d 949, 959 [13], but that elementary principle is not decisive in this case. There is considerable merit in the respondents' contention that all the appellant really proved is that she has married and can now provide I. with a home; that is ordinarily not sufficient to justify a modification of the custody order in a case of this kind. Dansker v. Dansker, Mo.App., 279 S.W.2d 205, 209 [6]. Nevertheless, we are not inclined, in this instance, simply to defer to the trial court's judgment and let the matter go at that.
In the first place, there are disturbing uncertainties in the evidence of both parties. Some of these matters are intangible and cannot be readily depicted, but we may suggest a few. The appellant has recently married a man whose marital career has been markedly unsuccessful. His acquaintance with I., and hers with him, is very limited. He proposes to adopt I. at the earliest possible time, if possible, but beyond his own expansive testimony, we know little or nothing of his character, his level of education, his past experience in rearing children, or his qualification as a stepfather or adoptive father. At the same time, there are suggestions of instability in the home in which the child now lives. The "nervous exhaustion" which Mrs. T. suffered just before trial is also described in the record as "blackout spells," an ailment to which she is subject from time to time, and we are left in doubt concerning the state of her health. It also appears that Mr. and Mrs. T. move frequently, and that recently they have departed the jurisdiction for an indefinite stay without considering it necessary to advise the court, whose ward they have in custody. Both parties described their homes; the appellant's is a four-room apartment in south St. Louis, and the respondents' is a three-room frame house in Golconda, Illinois, but neither party produced any evidence which is really descriptive of the surroundings and home environment in which the child would be reared should they be awarded custody, and this is perhaps the single most important consideration in any custody case. H____ v. D____, Mo.App., 373 S.W.2d 646, 654 [7].
We note these inadequacies in the record because this case is, to use a hackneyed phrase, "at a crucial stage." I. has been with Mr. and Mrs. T. since she was about 18 months old. She is now nearly eight. Mr. and Mrs. T. have been *22 the only parents she has ever known, and they have provided the only home she can remember. Uprooting her from these familiar surroundings, abruptly and permanently, "could result in bewilderment and emotional trauma," In re J____, Mo.App., 357 S.W.2d 197, 200-201 [6], and such a step taken unadvisedly "could have a disastrous effect on [her] future course." McCoy v. Briegel, Mo.App., 305 S.W.2d 29, 39 [19]. Needless to say, this separation, if it takes place, will become more and more difficult as time goes by. The respondents emphasize this consideration as a reason for leaving the child where she is, but for the same reason we are strongly of the opinion that if a change of custody is to be made, it should be done now, rather than later, if it is in the child's interest to return to her mother. It is not the purpose of statutory neglect proceedings to find substitute or foster parents for children; the State has an interest in the integrity of the family, and in such proceedings parental rights should be limited only "to the extent necessary to achieve the most desirable goal, wherever possible, of reinstating the natural and normal parent and child relationship." State v. Couch, Mo.App., 294 S.W.2d 636, 640 [8]. See also In re Jewish Child Care Association, 5 N.Y.2d 222, 183 N.Y.S.2d 65, 156 N.E.2d 700, 703-704 [3] [4, 5]; Fronk v. State, 7 Utah 2d 245, 322 P.2d 397, 402 [3]. There is no suggestion that the appellant is now living an immoral or dissolute life, and abandonment and neglect of a minor child may be repented of and terminated. In re Adoption of J____, Mo.App., 396 S.W.2d 257, 262 [7]; State v. Pogue, supra, 282 S.W.2d at 587. Indeed, the appellant seems to have made a good faith effort to resume the obligations and duties of parenthood. She has traveled considerable distances to visit her child, and her contact with I. might have been greater had not Mr. and Mrs. T. moved "at least three or four times," the last time to Golconda, Illinois. The appellant has contributed substantially to the support of her child, as her cancelled checks show. She has several times come into court seeking custody of her child, and there are doubtless limits to her means and resilience. Yet without further knowledge of the disposition and character of the proposed stepfather, the mutual attitude and feeling of the child and the appellant's husband, and considerably more information concerning the home environment and surroundings in which the child would be reared, were she returned to her mother, a change of custody would be an experiment, which we are not inclined to approve. H____ v. D____, supra, 373 S.W.2d at 654-655 [7, 8].
It is our duty to dispose finally of a case before us on appeal, if possible, Rule 83.13(c), V.A.M.R.; State ex rel. George v. Mitchell, Mo.App., 230 S.W.2d 116, 120 [5]; Axsom v. Thompson, 239 Mo.App. 732, 739, 197 S.W.2d 326, 331 [8-10], but this presupposes a record and evidence upon which we can rule with some degree of confidence in the reasonableness, fairness and accuracy of our final conclusion. Phelps v. Watson-Stillman Co., 365 Mo. 1124, 1132, 293 S.W.2d 429, 435. The record before us is not sufficient for us to say with any degree of confidence what disposition of the child's custody should be made. The trial court reluctantly permitted the appellant to show, in a very limited way, the circumstances as they existed prior to this hearing, but in this particular, and with deference to the trial court, we think the appellant was unnecessarily limited. Of course, in hearings of this kind, the court may not thresh over old straw; the prior orders are final adjudications in respect of the conditions then existing. But as the appellant was obliged to show a change of conditions, she should have been permitted to show, in a general way, the circumstances as they existed prior to this hearing in order to furnish a basis for determining whether there had been a material change of conditions. Garbee v. Tyree, Mo.App., 400 S. W.2d 193, 195-196 [1-5]; S____ v. G____, *23 Mo.App., 298 S.W.2d 67, 75 [6]. We also believe the court should hear from Mrs. T., if she now wishes to testify; we have only Mr. T.'s fragmentary self-appraisal to illuminate the respondents' side of the case, and he is not the one who cares for the child from day to day. We do not underestimate the difficulty in obtaining reliable evidence in a case of this kind, but "the very nature of the question demands an inquiry broad enough to reach every facet of the paramount issue, to-wit, the welfare of the child," S____ v. G____, supra, 298 S.W.2d at 75 [7], and that has not been had here. The judgment is therefore reversed and the cause is remanded for further hearing not inconsistent with the views herein expressed.
STONE and TITUS, JJ., concur.