11 Md. App. 280 (1971)
273 A.2d 644
HARRY GOODYEAR
v.
CECIL COUNTY DEPARTMENT OF SOCIAL SERVICES.
No. 232, September Term, 1970.
Court of Special Appeals of Maryland.
Decided February 17, 1971.
The cause was argued before ANDERSON, MORTON, THOMPSON, and POWERS, JJ.
*281 Edwin B. Fockler, III, for appellants.
Judson P. Garrett, Jr., with whom was William B. Calvert on the brief, for appellee.
MORTON, J., delivered the opinion of the Court.
The Chancellor below, after a plenary hearing, granted the petition of the Cecil County Department of Social Services to be appointed guardian of three year-old Richard Lee Goodyear, with the right to consent to his adoption and the right to consent to long-term care short of adoption.
In this appeal, the natural parents, Harry Goodyear and Ethel Goodyear, his wife, vigorously urge this Court to reverse the decree on the ground that the Chancellor committed error in finding that their consent to the granting of the petition was withheld contrary to the best interests of the child.
The Department of Social Services brought the proceeding under the provisions of Md. Code, Art. 16, § 72-74. Section 72 provides, in part, that "A petition for adoption * * * may be preceded by a petition for guardianship with the right to consent to adoption, and such guardianship decree [if granted] * * * shall terminate natural parental rights, [duties and obligations][1] and the duly appointed guardians consent to an adoption * * * shall eliminate the necessity of further notice to the natural parents * * *." Rule D 73 of the Maryland Rules of Procedure provides:
"A decree of adoption or guardianship with the right to consent to adoption shall not be entered until there has been filed in the proceeding the signed and verified consent required by law, or unless the Court shall have found after hearing that a consent required by law had been withheld contrary to the best interests of the child."
*282 In the case at bar the "consent required by law", referred to in the Rule, is governed by Md. Code, Art. 16, § 74, which requires the consent of "both the natural parents, if married, if they are alive and have not lost their parental rights through court action or voluntary relinquishment or abandonment."
The record before us reveals that at the time of Richard's birth on April 22, 1966, Mrs. Goodyear was married to John Hicks whom she divorced on April 24, 1967. Several days later she married Harry Goodyear who subsequently executed an "Affidavit of Paternity" acknowledging that he was the natural father of Richard. During the span of her marriage to John Hicks, Mrs. Goodyear had eight children by him, five of whom are either married or over eighteen and three of whom are in the custody of John Hicks who has since remarried.
Mr. Goodyear, prior to his marriage to Mrs. Goodyear, had been twice married and divorced. The first marriage occurred when he was twenty years old and ended when he returned home from a two year tour of military duty overseas and found his wife with a seven months old child. The second marriage lasted 19 years and terminated when his wife obtained a divorce on the ground of adultery with the present Mrs. Goodyear which apparently resulted in the birth of Richard.
The sequence of events leading to the appellee's petition for guardianship began March 17, 1967, when Richard was almost 11 months old. At that time the Juvenile Court of Cecil County found Richard to be a "neglected child" and committed him to the care of the Cecil County Department of Public Welfare (now the Cecil County Department of Social Services). The record reveals that this action was taken after the Department was notified by a former neighbor of the Goodyears that Richard had been left in her care by the Goodyears and that she could no longer care for him. On April 28, 1967, Harry and Ethel were married and thereafter, on August 28, 1967, they filed a petition for the custody of their son. On December 1, 1967, Richard was returned to his parents *283 under the protective supervisory assistance of the Department of Social Services. This supervision was suspended on October 28, 1968, however, because Mrs. Goodyear left the State of Maryland with Richard. When Richard was returned to Maryland by his mother, another hearing was held and he was again found to be a neglected child. He was placed in a foster home in January 1969 and was still residing there at the time of the hearing below on January 15, 1970.
It is apparent from our reading of the record that the appellants did not "volunarily relinquish or abandon" their parental rights. Both parents expressed love for Richard and a desire to have him back in their home. They were, as the lower court described it, "reasonably faithful" in visiting Richard at the times provided for these visits and on numerous occasions contacted the social worker handling Richard's case asking that they be allowed to see him more often. Moreover, the appellants are providing more than adequate financial support for their son and have bought him many gifts in addition to the regular support payments. Appellants have in no way evinced "a settled purpose to forego all parental duties and relinquish all parental claims to the child, and to renounce and forsake the child entirely" and, thus, have not forfeited or lost their parental rights by "abandonment" as contemplated by § 74 (b). See Logan v. Coup, 238 Md. 253, 258, and Ex Parte Johnson, 247 Md. 563.
As such, their consent is needed before the petition can be granted unless it is determined, as the lower court did here, that they are withholding their consent contrary to the best interests of the child. It is a well entrenched policy in this State in both custody and adoption cases that the interests of the child are paramount. Lippy v. Breidenstein, 249 Md. 415, 420. On the other hand, since the consequential loss to a natural parent in an adoption case is much more drastic than in a custody case, adoption will never be decreed over the objection of *284 a natural parent or parents unless that "course is clearly justified." As the Court of Appeals stated in Walker v. Gardner, 221 Md. 280 at 284:
"Unlike awards of custody, however, adoption decrees cut the child off from the natural parent who is made a legal stranger to his off-spring. The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationship have led the Legislature and this Court to make sure as far as possible, that adoption shall not be granted over parental objection unless that course is clearly justified. The welfare and best interest of the child must be weighed with great care against every just claim of an objecting parent."
Professor John S. Strahorn in his article Adoption In Maryland, 7 Md. L. Rev. 275, after an extensive analysis of the cases, concluded that "the Court of Appeals has indicated that it will not permit trial courts to decree adoptions over the expressed objection of the natural parent or parents, save in very strong cases."
The determination of whether or not parental consent is being withheld contrary to the best interests of the child necessarily depends on the facts of each particular case. It is evident, however, from a review of the numerous cases decided by the Court of Appeals, that "willful abandonment, failure to contribute to support, neglect to see or visit and unfitness of a natural parent are some of the more important factors" to be considered by a court in reaching its conclusion. Sheller v. Fink, 231 Md. 302.
In the case at bar, the lower court, apparently, based its finding that the appellants withheld their consent against the best interests of their child on the ground that they were unfit parents. There was ample evidence before the court that the relationship between the appellants was extremely unstable. The record reveals that the Goodyears have separated and reunited on numerous *285 occasions after having arguments in their home. They have sworn out warrants for each other's arrest on more than one occasion and have consistently blamed each other for the problems they have experienced. Moreover, since Richard's birth, they have lived in a number of different locations both inside and outside Maryland. Mrs. Goodyear filed for divorce on the grounds of adultery but later dismissed the proceeding.
The two social workers who testified at trial felt that the prognosis for the future stability of the Goodyear household was very poor in light of these problems and that the appellants would be unable to solve the problems by themselves. They also stated that the appellants often discussed their problems in front of Richard during their visits with him and that this was harmful to the child.
However, one of the social workers, when asked at the hearing if the Department of Social Services had any tentative plans for Richard's future, stated: "We have adoptive parents, adoptive applicants, and generally try to match the background of the child, his potential, with the potential of the adoptive parents' home. And this is a process that can take anywhere from, you know, one month to six months to a year, depending on if the child is highly adoptable."
It is apparent, therefore, that with the exception of terminating the parent-child visits, which were described as harmful to the child, no affirmative or positive plans have been formulated by the appellee to create a favorable and permanent environment for Richard which might be measured or compared with the resulting loss of all ties with his natural parents. Under the present proposal of the appellee, Richard could conceivably remain in his present foster home for a year or longer while adoptive parents are being sought. It is equally conceivable that during such period the conditions causing the instability of the appellants, which appear to be emotional in nature, may well become corrected, thus making them "fit" to have Richard returned to their custody. *286 See Ex Parte Johnson, supra. This possibility is particularly significant in light of the testimony at the hearing that the appellants had been living together three months without incident and that, according to Mr. Goodyear, he and his wife had "ironed out" their problems and felt that they could get along together in the future.
We do not have a situation where the child to be adopted has been in the custody of individuals seeking his adoption or exposed to them in a manner which would engender feelings of love, affection and emotional attachment toward them. Nor do we know or have any conception of the type of parents, environment or surroundings which will be provided Richard in any proposed future adoptive home which could form a basis for a determination that it would be in Richard's best interest to be taken permanently from his natural parents. See Atkins v. Gose, 189 Md. 542; Alston v. Thomas, 161 Md. 617.
In effect the court below concluded that the instability of the appellants, admittedly severe in the past and not hopeful of correction in the future, was sufficient to justify a permanent severance of Richard's ties with his natural parents, who loved him and were financially able and willing to support him, at a time when the family into which he was to be adopted was as yet an unknown quantity.
While the evidence before the lower court was sufficient to support a finding that Richard's best interest would be served by his remaining in the foster home for the present time, we think that the record before us falls far short of justifying the drastic result of permanently terminating the appellants' parental rights, which result would flow from the lower court's decree granting guardianship with the right to consent to adoption. The conclusion we here reach comports with and, in our opinion, is compelled by the holdings and views heretofore expressed by the Court of Appeals. See particularly Lippy v. Breidenstein, supra; Beltran v. Heim, 248 Md. 397. See *287 also Ex Parte Johnson, supra; Logan v. Coup, supra; Shetler v. Fink, supra; White v. Seward, 187 Md. 43; Connelly v. Jones, 165 Md. 544.
Decree Reversed;
Appellee to pay the costs.
NOTES
[1] Inserted by Ch. 144 of the Laws of 1970.