Rogelio Francisco DELGADO, Appellant,

v.

John M. FAWCETT and Barbara Jean Fawcett regarding the Adoption of Angela Joan Delgado, et al., Appellees.

No. 1594.

Supreme Court of Alaska.

Oct. 29, 1973.

A. Fred Miller, Ketchikan, for appellant.

William H. Timme, Alaska Legal Services, Ketchikan, for appellees.

OPINION

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

RABINOWITZ, Chief Justice.

This is an appeal from adoptive decrees.

On May 17, 1968, Rogelio Delgado and his wife, Barbara Jean, separated. Barbara Jean left California, where she and her husband had been living, and returned with the three Delgado children to her former home in Metlakatla, Alaska. Rogelio and Barbara Jean Delgado were divorced on November 18, 1969, by a California court. The court awarded Barbara Jean custody of the three children, but reserved to Rogelio reasonable visitation rights. The court also directed Rogelio to pay $150 per month for the support of the children.

Following her divorce from Rogelio Delgado, Barbara Jean married appellee, John M. Fawcett. After their marriage, Fawcett filed petitions with the Superior Court of the First Judicial District in Ketchikan, Alaska, to adopt the three children. Although Rogelio Delgado received notice of the proceedings, he neither consented to the adoptions nor participated in the hearings. After holding hearings, the superior court granted the petitions for adoption. Delgado appeals from separate decrees of adoption entered by the superior court, arguing that the superior court had no authority to grant the adoptions without his prior consent.

The effect of an adoption is to permanently terminate the legal relationship of parent and child, except when the natural parent is the spouse of the adopting parent.[1] Under our adoption statutes,

> Written consent to adoption shall be filed before a hearing on the petition . . . if the person to be adopted is a minor of legitimate birth or a minor

1. AS 20.10.120.

whose birth has been subsequently legitimatized, then by each of his living parents, except as otherwise provided; . . . [2]

However,

Consent for adoption of a minor is not required . . . from a divorced parent who was not awarded full or *part-time custody of the child;* . . . [3] (Emphasis added.)

One of the questions presented by this appeal is whether the rights granted appellant under the California divorce decree amounted to "full or part-time custody" within the meaning of AS 20.10.040.

The requirement of parental consent as a prerequisite to adoption is hardly unique to Alaska. It is a part of the adoption law of nearly all jurisdictions.[4] In this regard, the Supreme Court of Minnesota said in construing a consent statute similar to Alaska's:

The correlative rights and duties inherent in the parent-child relationship are natural rights of such fundamental importance that it is generally held that parents should not be deprived of them "except for grave and weighty reasons." In an adoption proceeding, where an absolute severance of this relationship is sought, the consent provisions are designed to protect the natural rights of a parent to the custody, society, comfort, and services of the child.[5]

We are of a like opinion.

Nonetheless, the Alaska Legislature did not make the right of parental consent absolute and unqualified. Under AS 20.10.040, a parent is denied the right to peremptorily veto the adoption of his child if the parent a) has been adjudged insane; b) is imprisoned; c) has abandoned his child; d) is divorced and has not been awarded full or part-time custody of the child; e) has been adjudged unfit to have the care and custody of the child; or f) is the natural father and the child is a minor of illegitimate birth who has not been legitimatized.[6]

"Custody" has no fixed legal signification. It involves a variety of parental rights and duties which vary according to the circumstances of the relationship of

---

2. AS 20.10.020(2).

3. AS 20.10.040(5).

4. H. Clark, The Law of Domestic Relations in the United States § 18.4, at 620 (1968). *See, e. g.,* Cal.Civ.Code Ann. § 224 (Deering 1971); Minn.Stat.Ann. § 259.24 (1971); N.M.Stat.Ann. § 22–2–25 (1953). *But see* Md.Code Ann. art. 16 § 74 (1973) (parental consent to adopt not required where court finds consent is withheld contrary to the best interest of the child).

5. In re Parks' Petition, 267 Minn. 468, 127 N.W.2d 548, 553 (1964) (footnote omitted).

6. AS 20.10.040 provides:
Consent for adoption of a minor is not required
    (1) *from a parent* who was more than one year prior to the filing of a petition for adoption *adjudged to be insane,* and not thereafter legally declared sane;
    (2) *from a parent who is imprisoned* in the penitentiary at the time of the filing of the petition under sentence for a term of three years or more;
    (3) *from a parent whose wilful abandonment of the child has been established* in a judicial proceeding;

(4) *from a parent whose wilful abandonment for a period of not less than 30 days preceding the filing of the petition is established in the adoption proceeding;* but the parent shall be personally served with a copy of the petition and notice of hearing inside or outside the state not less than 20 days before the date of the hearing;

(5) *from a divorced parent who was not awarded full or parttime custody of the child;* but the parent shall be personally served with a copy of the petition and notice of hearing inside or outside the state not less than 20 days before the date of the hearing;

(6) *from a parent adjudged by the court to be unfit* to have the care and custody of the child, but a copy of the petition and notice of hearing shall be served upon the parent by personal service inside or outside the state at least 20 days before the hearing;

(7) *from the natural father if the person to be adopted is a minor of illegitimate birth, not subsequently legitimitized,* and notice need not be given him. (Emphasis added.)

the child to the parent.[7] "Custody" pertains not only to the parental control of the child, but is inseparably linked to the parent's rights of access and companionship with his offspring. There are, of course, no precise contours to the complex of rights denoted by "custody," and similarly there can be no fixed catalogue of the parental rights and responsibilities to which "part-time custody" relates.

▮ It may be argued that whenever one parent is awarded full custody of a child and the other visitation rights, under our statute, the consent of the parent possessing visitation rights is not necessary for adoption. We think that such a reading of AS 20.10.040(5) is excessively literal and inconsistent with the legislative intent evident from the statute as a whole.[8] We think that by reserving the right to veto an adoption to parents with "full or part-time custody," the legislature intended to include within that class persons who retain reasonable visitation rights to their children.

▮ Implicit in AS 20.10.040 is the legislative judgment that a parent who has manifested an inability or unwillingness to discharge the rights and duties of a parent shall be considered to have forfeited his right to obstruct an adoption. By contrast, the fact that a divorce decree awards custody to one parent, and "visitation rights" to the other may in no way reflect upon the non-custodial parent's fitness. The courts of this state are to be guided by the best interests of the child in determining the custody and visitation rights of the parents.[9] The same rule controls in California, the state where the Delgados were divorced and the custody of the children awarded.[10] Presumably, the California court decided that the best interests of the Delgado children would be served by awarding visitation rights to the appellant. The fact that the mother received "custody" and the father visitation rights does not indicate that the father has been adjudged an unfit parent, or that he has forfeited his parental rights.

A number of other jurisdictions have adoption statutes which, like Alaska's, dispense with the necessity of consent from a parent who does not have "custody." The Supreme Court of Minnesota has construed its statute to mean that the natural parent must consent to an adoption unless it appears that his unfitness as a parent has been adjudicated in the divorce proceedings, and that his right to custody has been extinguished.[11] In Nelson v. Bye [12] The same court observed that:

> . . . In the absence of evidence of unfitness which would warrant severance of the parent-child relationship in the interest of the child's welfare, the right of the natural parent who initially loses custody of a child as a result of a divorce decree should not be extinguished so as to prevent such parent from seeking custody in the event of death, subse-

7. P. Sayre, Awarding Custody of Children, 9 U.Chi.L.Rev. 672 (1942).

8. "A statute is to be construed with reference to its manifest object, and if the language is susceptible of two constructions, one of which will carry out, and the other will defeat, such manifest object, it should receive the former construction." In re National Guard, 71 Vt. 493, 45 A. 1051 (1899), quoted in 2 J. G. Sutherland Statutory Construction § 4704, at 338 (3d ed. 1943). *Accord*, State v. American Can Co., 362 P.2d 291, 296 (Alaska 1961).

9. Rhodes v. Rhodes, 370 P.2d 902 (Alaska 1962.) *Accord*, King v. King, 477 P.2d 356 (Alaska 1970); Bass v. Bass, 437 P.2d 324 (Alaska 1968). In *Rhodes* we sustained an award of custody to the mother of a child where both parents were found to be fit, but where the trial court determined that the best interests of the child would be served by giving custody to the mother.

10. Cal.Civ.Code Ann. § 4600(a) (Deering 1971).

11. In re Parks' Petition, 267 Minn. 468, 127 N.W.2d 548 (1964).

12. 271 Minn. 194, 135 N.W.2d 700 (1965).

quent divorce, or other changes in circumstances of the prevailing party.[13]

The court in *Nelson* held that visitation rights were sufficient to reserve to a parent the right to veto a proposed adoption. Similar positions have been taken by other courts in construing their consent statutes.[14]

In Hammer v. Hammer,[15] however, the District Court of the Territory of Alaska, concluded that under the territorial precursor to AS 20.10.040,[16] the right of visitation under a decree of divorce is not the equivalent of actual or part-time custody. We decline to follow that holding. Our reading of AS 20.10.040 leads us to the conclusion that the legislature intended that there should not be a conclusive termination of parental rights by adoption without either parental consent or a prior forfeiture of parental rights. The failure of a divorce decree to declare precisely that a parent has "custody" or "part-time custody" should not be dispositive of the question of whether consent of the parent must be had. We hold that a parent who has the right to visit his children must consent to the adoption of his children.

This does not mean, however, that a parent who has been awarded visitation may forever obstruct adoption, regardless of his conduct and the best interests of the child. A divorce decree may be modified. If it is shown that since the entry of judgment,

circumstances have changed so as to require a modification of the decree in the best interests of the children, a court may terminate parental rights of visitation.[17]

We therefore conclude that the trial court erred in holding that written consent of the father was not required.[18] Accordingly, we reverse the judgment of the superior court and direct it to vacate the decrees of adoption which it entered.

ERWIN, Justice (dissenting).

I dissent from the views expressed by the majority. The majority has equated the concept of visitation rights with the legal definition of custody and, in the process, has deprived the Alaska courts of the ability to grant adoptions in cases where adoption may, in fact, be in the best interest of the child or children involved.

I feel strongly that biological parenthood should never be used as a device to deprive children properly before the Alaska courts of a judicial determination on whether or not adoption is in their best interest. While I understand the fears of separated and divorced parents that they may be somehow deprived of their children by unjust means, I do not regard the denial of hearing in court on such an issue the better method of safeguarding against such occurrence.[1]

---

13. *Id.*, at 703. *Accord*, Eggert v. Van. De Weghe, 279 Minn. 31, 155 N.W.2d 454 (1967).

14. Onsrud v. Lehman, 56 N.M. 289, 243 P. 2d 600 (1952); Marston v. Marston, 389 P.2d 510 (Okl.1964); In re Lease, 99 Wash. 413, 169 P. 816 (1918). *See also* Burrell v. Burrell, 256 Iowa 490, 127 N.W.2d 78 (1964) (consent required of parent with one month custody per year plus reasonable visitation rights).

15. 16 Alaska 203 (D.C.Alaska 1956).

16. A.C.L.A. § 21-3-13 (1949).

17. AS 09.55.205. That section provides:
In an action for divorce or for legal separation the court may, during the pendency of the action, or at the final hearing or at any time thereafter during the minority of any child of the marriage, *make an order*

for the custody of or visitation with the minor child which may seem necessary or proper and may at any time modify or vacate the order. In awarding custody the court is to be guided by the following considerations:
(1) by what appears to be for the best interests of the child and if the child is of a sufficient age and intelligence to form a preference, the court may consider that preference in determining the question;
(2) as between parents adversely claiming the custody neither parent is entitled to it as of right. (Emphasis added.)

18. Our disposition of this issue makes unnecessary any consideration of appellant's other specifications of error.

1. *Cf.* decisions under Ann.Code of Maryland, article 16 § 74 (1973); Shetler v. Fink, 231 Md. 302, 190 A.2d 76 (1963); Schwartz v.

In my view, the judicial determination of what is the best interests of the children is the primary goal. A searching inquiry into the basic purpose of our statutory scheme reveals this purpose.

While Roman law and the civil law derived from it have long provided for legal adoption, no such procedure developed within the English common law.[2] Massachusetts, in 1851, was the first state in the nation to provide by statute for adoption; other states followed shortly thereafter. In 1865, Charles Dudley Field, Chief of the Code Commissioners appointed by the New York Legislature to draft a "civil code", presented to them his final draft. Included among the provisions of that code, in chapter 2, were a number of sections devoted to adoption. The Code Commissioner's comments appended to section 107 of that Act are quite instructive:

> The total absence of any provision for the adoption of children is one of the most remarkable defects of our law. Thousands of children are actually, though not legally, adopted every year; yet there is no method by which the adopting parents can secure the children to themselves except by a fictitious apprenticeship, a form which, when applied to children in the cradle, becomes absurd and repulsive. It is, indeed, so inappro-

priate in every case, that it is rarely resorted to. The consequence is almost invariably, that if the real parents of the child live to see it grow to an age of usefulness and intelligence, they are certain to attempt to reclaim it, sometimes through the mere selfishness of natural affection, but more commonly from base and sordid motives. The chances of an adopting parent for the retention of the child upon which, perhaps, his whole heart is centered, are therefore in the inverse ratio to the degree of his benevolence in its selection, and of his care and affection in its training. Benevolence dictates a choice from among children whose parents are least able or willing to take care of them. To relieve a child from a cruel and heartless parent is a greater mercy than to take even an orphan. Yet these are the parents who are, of all others, most likely to reclaim the child as soon as any money can be made out of it. Affection will give the child such a training as will develop its beauty and intelligence to the highest degree. Yet every grace of the child is but a premium upon the extortion of its heartless parents. This is not mere theory. Facts within the knowledge of almost every one justify these statements. There are very many childless parents who would gladly adopt children, but for

Hudgins, 12 Md.App. 419, 278 A.2d 652 (1971); Goodyear v. Cecil County Dept. of Social Services, 11 Md.App. 280, 273 A.2d 644 (1971), which provide for adoption in absence of parental consent in those strong cases where the facts show it is clearly justified by the evidence and in the best interest of the children.

2. For a general discussion of the history and development of the law of adoption, see Blom-Cooper, Adoption Applications & Parental Responsibility, 20 Modern L.Rev. 473 (1957) (gives the English and Commonwealth experience); Huard, The Law of Adoption: Ancient & Modern, 9 Vand.L.Rev. 743 (1956); Katz, Community Decision Makers & the Promotion of Values in the Adoption of Children, 4 J. Family L. 7 (1964); Katz, Judicial and Statutory Trends in the Law of Adoption, 51 Geo.L.J. 64 (1962); Presser, The Historical Background of the American

Law of Adoption, 11 J. Family L. 443 (1971); Quarles, The Law of Adoption: A Legal Anomaly, 32 Marq.L.Rev. 237 (1949); Symposium: Adoption, 40 Ia.L.Rev. 225 (1955), which includes: Uhlenhopp, Adoption in Iowa, id. at 228–98; Merrill and Merrill, Toward Uniformity in Adoption Law, id. at 299–328; Martire & McCandless, Psychological Aspects of the Adoption Process, id. at 350–63; Yost, Adoption Laws of Ohio: A Critical and Comparative Study, 21 Clev.St. L.Rev. 1 (1972); Comment, Revocation of Parental Consent to Adoption: Legal Doctrine & Social Policy, 28 U.Chi.L.Rev. 564 (1961); Note, Natural vs. Adoptive Parents: Divided Children & the Wisdom of Solomon, 57 Ia.L.Rev. 171 (1971); Note, Adoption & the Unreasonable Parent, 34 Modern L.Rev. 681 (1971); Note, Termination of Parental Rights to Free Child for Adoption, 32 N.Y. U.L.Rev. 579 (1957).

their well founded fears that they could never hold them securely.[3]

These sentiments, so modern in expression, unfortunately did not lead to the widespread protection of dependent and neglected children envisioned by the commentators.[4] Partly from too great a dependence on legalistic niceties so common in the late nineteenth century, and partly because of an unrealistic conception of parent-child relationships, courts consistently refused to grant adoptions that would have protected children in deference to the sensibilities of natural parents who would play little part in the growth and development of the affected children.[5] Thus, thousands of children throughout the United States found themselves in the bleak surroundings of frequently understaffed and ill-accommodated institutions simply because their parents, having no responsibility for them, nevertheless (whether through the "mere selfishness of natural affection or the base and sordid motives" mentioned by the code commentators) refused to "consent" to adoption.[6]

The problem of consent arises because children were originally viewed as chattels and adoptions were viewed as a contractual relationship between the natural parent or other custodian surrendering parental rights and duties, and the prospective adoptive parents assuming those rights and duties. Thus, since a contract cannot be executed in the absence of mutual agreement, an adoption could not be effected without the consent of the natural parents.[7]

From the beginning, however, in order to carry out the intentions of the statute, a number of circumstances were set forth under which a parent's consent could be dispensed with. Illustrative is the Field Code provision:

> Sec. 110. A legitimate child cannot be adopted without the consent of its parents, if living, nor an illegitimate child without the consent of its mother, if living, except that consent is not necessary from a father or mother deprived of civil rights, or adjudged guilty of adultery or of cruelty, and for either cause divorced, or adjudged to be a habitual drunkard, or who has been judicially deprived of the custody of the child, on account of cruelty or neglect.

The original Alaska statute[8] was in form essentially the same as this Field

---

3. The Field Code adoption provisions were not adopted in New York until 1873; see Brosman, *supra* n. 2, *passim. See also* Presser, *supra* n. 2, at 487.

4. *See, e. g.,* Uhlenhopp, *supra* n. 2, at 230–31.

5. *See* authorities cited n. 2, *supra.* The accepted relationship between child and foster parents is graphically illustrated by In Re Jewish Child Care Association, 5 N.Y.2d 222, 183 N.Y.S.2d 65, 156 N.E.2d 700 (1959), where a divided New York Court of Appeals removed a happy five year old from an excellent foster home in which she had spent 4½ years of her life because the foster parents were *"too attached to the child"* and this attachment might adversely affect the child's feelings towards its absent mother. This decision is persuasively criticized in Katz, Foster Parents v. Agencies: A Case Study in the Judicial Application of "The Best Interests of the Child" Doctrine, 65 Mich.L. Rev. 145 (1966).

6. *See* Simpson, The Unfit Parent: Conditions Under Which a Child May be Adopted Without the Consent of His Parent, 39 U.Det.L.J.

347 (1962); Gordon, Terminal Placement of Children and Permanent Termination of Parental Rights: The New York Permanent Neglect Statute, 46 St. John's L.Rev. 215, 218–20 (1971) (summarizes statistics regarding children in foster care whose parents neither keep contact with them nor will consent to their adoption by others—estimates 134,000 nationwide in 1968 in this category).

7. *Cf.* Fritts v. Krugh, 354 Mich. 97, 92 N.W. 2d 604 (1958); Sayre, Awarding Custody of Children, 9 U.Chi.L.Rev. 672, 675 (1942).

8. Brown, The Sources of the Alaska and Oregon Codes, part I, 2 UCLA–Alaska L.Rev. 15 (1972). Congress in legislating a code of laws for the then territory of Alaska in 1900 drew primarily from the then laws of Oregon. *See* City of Fairbanks v. Schaible, 375 P.2d 201, 207 (Alaska 1962). The Oregon Adoption Code was at that time *sui generis* but was drawn in part from Field's work on the New York Codes; see Harris, History of the Oregon Code, part I, 1 Ore.L.Rev. 129 (1922); part II, 1 Ore.L.Rev. 184, 210–15, esp. 215 (1922). Variations of the Field

Code provision.[9] The present section is AS 20.10.040. Paragraph five provides in relevant part:

> *Consent not required.* Consent for adoption of a minor is not required . . .
> (5) from a divorced parent who was not awarded full or parttime custody of the child; but the parent shall be personally served with a copy of the petition and notice of hearing inside or outside the state not less than 20 days before the date of the hearing . . . .

AS 20.10.040(5) provides that consent is not needed from a parent who does not have full or part-time custody. The majority finds that a reasonable visitation right is tantamount to part-time custody, and the parent's consent is necessary.[10]

Appellant additionally argued that it would be a denial of equal protection to require consent of the non-custodial parent in the absence of gross unfitness on his part on the theory that since divorce has nothing to do with moral obliquity, there is nothing in the grant of custody in a divorce action which terminated the right of either parent.[11] Thus, any subsequent adoption proceeding can only advance to full hearing when "gross neglect" of the noncustodial parent can be established.

It is my opinion that each of these positions is too narrow an interpretation of the various constitutional rights involved and, if followed to the logical conclusion, would make the rights of the parents paramount over the rights of the children. While

---

Civil Code were adopted in a number of the western states. *See* Harrison, The Half-century of the California Civil Code, 10 Calif. L.Rev. 185, 187 (1922). Its Code of Civil Procedure was more fortunate. *See* Albertsworth, Theory of Code Pleadings in Code States, *id.* at 202, 205–06, esp. n. 8 at 205 (1922).

9. There is an important difference between the original Alaska and Field Code provisions, however. The Alaska provision makes no reference at all to parents deprived of custody in a divorce proceeding but dispensed with consent where the parent was unfit to "have the care and custody". The Alaska provision, Carter's Code § 22 (1900), dispensed with consent as follows:

> If either parent is insane or imprisoned in a penitentiary under a sentence for a term not less than three years, or has willfully deserted and neglected to provide proper care and maintenance for the child for one year next preceding the time of filing the petition, or is an unfit person to have the care and custody of the child, the commissioner may proceed as if such person were dead, and in his discretion may appoint some suitable person to act in the proceeding as guardian ad litem of the child, and give or withhold the consent aforesaid; but in all cases notice to the parent, not laboring under said disabilities of insanity or imprisonment mentioned in this section, shall be required.

This provision remained the law of Alaska through the various codifications until 1947. *See* CLA 1913 § 449; CLA 1933 § 1143, repealed by ch. 51 SLA 1947; *see also* ACLA 1949 § 21–3–11 et seq.

10. *E. g.*, Marston v. Marston, 389 P.2d 510 (Okl.1964); In re Lease, 99 Wash. 413, 169 P. 816 (1918).

> Washington has attempted to meet the problem by incorporating visitation into the no-consent statute. Consent is not needed from the noncustodial parent
>
> > [p]rovided, [t]hat a decree in an action for divorce, separate maintenance, or annulment, which grants to a parent any right of custody, control, or visitation of a minor child, . . . shall not constitute such deprivation of custody . . . .
>
> Rev.Code of Wash. 26.32.040(2). California has also made an attempt to codify visitation rights. Section 224 of the Civil Code provides that consent is not necessary from a noncustodial mother who fails to communicate with the child for one year when able to do so, or from a noncustodial father who fails to pay for the care, support and education of the child for one year when able to do so.

11. *See* State v. McMaster, 259 Or. 291, 486 P.2d 567 (1971); In re Adoption of Smith, 229 Or. 277, 366 P.2d 875 (1961); Larsen, Trends & Developments in Oregon Family Law: Parental Rights and Child Welfare, 43 Ore.L.Rev. 193 (1964).

See discussion in Burt, Forcing Protection on Children and Their Parents: The Impact of Wyman v. James, 69 Mich.L.Rev. 1259, 1268–88 (1971); Dobson, The Juvenile Court and Parental Rights, 4 Family L.Q. 393 (1970); Sullivan, Child Neglect: The Environmental Aspects, 29 Ohio St.L.J. 85 (1968); Young, The Problem of Neglect—The Legal Aspects, 4 J. Family L. 29 (1964); Note, Child Neglect: Due Process for the Parent, 70 Colum.L.Rev. 465 (1970).

several recent cases of the Supreme Court of the United States [12] have reaffirmed the doctrine of parental rights, these same cases and a number of our own [13] have clearly recognized the constitutional rights of children.

In order to give effect to the views expressed in all of these cases, I would find that the veto power expressed in the consent statute, AS 22.10.040, should be strictly construed to those incidents clearly spelled out in the statute. If such a veto in a noncustodial parent is expanded in areas not specifically spelled out by statute, the result will be to deprive the child of a judicial determination of the propriety of an adoption, a possibility which could work injustice and hardship.

It must be emphasized that availability for adoption, coupled with the noncustodial parent's loss of a veto of that adoption, does not mean that an adoption will be allowed. In many cases, a parent who is unable to provide support and care to a child could nevertheless maintain a relationship with him such that an adoption terminating that relationship would be unwise and not in the child's best interest.[14]

By the same token, many children may have reached an age at which they do not wish to be adopted. Adoption is of primary value almost in indirect proportion to the age of the child. The younger the child, the more he would be served by es-

tablishing a permanent new parental relationship.[15]

A further caution should be interjected. This interpretation of AS 20.10.040(5) does not mean that every child whose parents are divorced and every child who is temporarily taken from the home because of inadequacies in that home would be immediately adopted. Someone must develop a sufficient relationship with the child to file a petition and notice, and an opportunity to defend must be given the parents. Further, indigent parents are entitled to the appointment of counsel. The factor which more than any other justifies termination of parental rights and availability for adoption is long-term separation from the natural parents, whether from the parents' fault or for reasons beyond their control. Thus, it is only when the child has had an opportunity to develop a close personal relationship with a third party that that third party should be allowed to adopt it. The development of that relationship generally takes a long period of time.

The interpretation placed on AS 20.10.040(5) will not mean that the children of the poor will become the prey of wealthy childless families. No court has ever viewed the child's best interest on a purely material or economic scale. As Martire and McCandless point out:

> Superficial factors, such as social and economic status and prestige are essen-

12. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); May v. Anderson, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923).

13. Breese v. Smith, 501 P.2d 159 (Alaska 1972); In re G. K., 497 P.2d 914 (Alaska 1972); Doe v. State, 487 P.2d 47 (Alaska 1971); R. L. R. v. State, 487 P.2d 27 (Alaska 1971); In re G. M. B., 483 P.2d 1006 (Alaska 1971).

14. The only difference between deprivation of custody through divorce and termination

of parental rights through adoption is that the former may be temporary and the latter is permanent, admittedly an important consideration. Nevertheless, the better reasoned view is that a custody determination once made should not be disrupted in the absence of substantial justification, i. e., the custodial parent should have a preference. See Watson, The Children of Armageddon: Problems of Custody Following Divorce, 21 Syracuse L. Rev. 55, 63–64, 76–77 (1969). The best interest of the child standard is controlling in each case. See Note, Legislative and Judicial Recognition of the Distinction Between Custody and Termination Orders in Child Neglect Cases, 7 J. Family L. 66 (1967).

15. Gordon, supra n. 6, at 232–33, 255–60; see Note, Adoption—Psychological v. Biological Parenthood in Determining Best Interests of the Child, 3 Seton-Hall L.Rev. 130, 141–42 (1971).

tially unimportant to the young child. These kinds of things are important only to adults in our society . . . . It can be emphasized that the child will be most comfortable and most secure where he is honestly loved and respected, no matter what the social or economic situation is. His ability to adapt is almost unlimited, provided he feels secure. In concrete terms, it is better for a child to be loved and respected by poor people than to be rejected and not accepted by rich people.[16]

But, it is equally true that love and affection are not necessarily synonymous with a natural parent-child relationship:

> In light of the above factors, it is fair to say that biological parenthood is of less importance to the maturing child than psychological parenthood. As far as the child is concerned, he need not essentially care *who* loves him as long as *someone does*. Biological factors may lay the groundwork for future physical development, but the future personality development is conditioned by people who may or may not be biological parents. There is no *a priori* reason why a child should love and respect biological parents more than anyone else. He will like and learn from the people who are kind and helpful no matter what the blood relation. With this factor in mind, we need not be concerned with the child's reaction to new parents if the new parents are equally helpful to and accepting of him. The child will certainly have to adjust to new people under any circumstances of adoption but he will not consider the factor of blood relationship except, as others emphasize its importance.[17]

The courts of Alaska are clearly able to determine what the best interests of the children are in cases such as the one at bar. Conversely, it is too important an issue to be left to the possible whim of an absent parent.

In this case, the trial court held two separate hearings, where it heard the testimony of the mother and one of the children. It heard testimony concerning appellant's very infrequent communications with the children, the one seemingly unhappy visit made by the children to their father in California, the child's feeling of rejection by his natural father, and the strong family ties to their prospective father. The testimony also indicated a failure by the natural father to meet support obligations while the prospective adoptive father has been supplying most of the children's needs for a period in excess of four years.

While appellant was notified of his right to appear he chose not to come forward or present testimony bearing on the issue, apparently on the advice of legal counsel.[18]

Under these circumstances, I would uphold the findings of the trial court that adoption would be in the best interests of the children.[19]

16. Martire and McCandless, *supra* n. 2, at 355.

17. *Id.* at 354.

18. As represented by appellant's counsel at oral argument. *Cf.* Stanley v. Illinois, 405 U.S. 465, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

19. This standard is considered by the majority to be proper. Michigan has adopted the following elaboration of the best interest of the child in Mich.Stat.Ann. § 722.23(3) (1971):
(a) The love, affection and other emotional ties existing between the competing parties and the child.
(b) The capacity and disposition of competing parties to give the child love, affection and guidance and continuation of the educating and raising of the child in its religion or creed, if any.
(c) The capacity and disposition of competing parties to provide the child with food, clothing, medical care or other remedial care recognized and permitted under [Michigan law] in lieu of medical care, and other material needs.
(d) The length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.
(e) The permanence, as a family unit, of the existing or proposed custodial home.
(f) The moral fitness of the competing parties.
(g) The mental and physical health of the competing parties.

I am further disturbed that the present opinion will cause substantial problems to the trial courts and prospective adoptive parents in the case of children of unwed parents. If the married father who does not have custody may veto an adoption, it appears that under Stanley v. Illinois[20] a natural father may be permitted the same veto.

The only alternative to such veto is to have extensive hearings at the time of birth with opportunities to be present by the natural father. The practical problems of such a course are almost limitless. What is to be done when the natural fa-

ther is unknown or the mother refuses to disclose his name? What is to be done in those cases where there is a possibility the natural father is unaware of the birth? What happens to the baby during such a period? Are adoptions granted without consent of the natural father invalid? Since a great share of adoptive proceedings take place in this context, the weight of the present opinion is impossible to determine. The alternative court hearing in all cases avoids such problems.

I would affirm the decision of the trial court.

(h) The home, school and community record of the child.

(i) The reasonable preference of the child, if the court deems the child to be of sufficient age to express preference.

(j) Any other factor considered by the court to be relevant to a particular child custody dispute.

*See, also,* Watson, The Children of Armageddon: Problems of Custody Following Di-

vorce, 21 Syracuse L.Rev. 55 (1969); Bennett, Child Custody: Considerations in Granting the Award Between Adversely Claiming Parents, 36 So.Calif.L.Rev. 255 (1963).

20. 405 U.S. 465, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).